EXHIBIT C

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

IN RE LOESTRIN 24 FE          :   13-MD-02472(WES)
ANTITRUST LITIGATION          :
                              :   United States Courthouse
                              :   Providence, Rhode Island
                              :
                              :   Thursday, August 27, 2020

TRANSCRIPT OF CIVIL CAUSE FOR MOTION HEARING
BEFORE THE HONORABLE WILLIAM E. SMITH
UNITED STATES DISTRICT COURT JUDGE

For the Plaintiffs:     THOMAS M. SOBOL, ESQ.
                        KRISTEN A. JOHNSON, ESQ.
                        JESSICA R. MacAULEY, ESQ.
                        Hagens Berman Sobol Shapiro LLP

                        DAVID F. SORENSEN, ESQ.
                        ELLEN T. NOTEWARE, ESQ.
                        Berger & Montague P.C.

                        JOSEPH H. MELTZER, ESQ.
                        Kessler Topaz Meltzer & Check, LLP

                        PETER R. KOHN, ESQ.
                        DAVID CAVELLO, ESQ.
                        Faruqi & Faruqi, LLP

                        MICHAEL B. BUCHMAN, ESQ.
                        SHARON K. ROBERTSON, ESQ.
                        MARVIN A. MILLER, ESQ.
                        Cohen Milstein Sellers & Toll PLLC

                        STEVE D. SHADOWEN, ESQ.
                        Hilliard & Shadowen LLC

                        ROBERT J. McCONNELL, ESQ.
                        Motley Rice LLC

For the Defendants:     JACK E. PACE, III, ESQ.
                        J. MARK GIDLEY, ESQ.
                        White & Case LLP

                        NICOLE J. BENJAMIN, ESQ.
                        Adler, Pollock & Sheehan, PC

Court Reporters:  Lisa Schwam, CRR-RPR-RMR

1    (VIA ZOOM VIDEO CONFERENCE)

2    27 AUGUST 2020

3         THE COURT:  Good morning, everyone.  We're here

4    in the matter of In re Loestrin 24 FE antitrust

5    litigation, and we're here for the final hearing on the

6    approval of the class-action settlement for all

7    plaintiffs; the direct purchasers, the end-payors, and

8    the third-party purchasers.  So let's have counsel

9    identify themselves for the record.  I'd suggest that

10   maybe those of you who are going to be primary

11   spokespersons for your parties just introduce

12   yourselves as well as your colleagues for whom you want

13   to enter appearances.

14        MR. SOBOL:  Good morning, your Honor.  Perhaps

15   I'll start first.

16        THE COURT:  Sure.

17        MR. SOBOL:  Good morning, your Honor.  Tom

18   Sobol, Hagens Berman Sobol Shapiro, for the direct

19   purchasers.  I will be doing the speaking for our

20   group.  I note from the participants' list that I see

21   for the direct purchasers we also have David Cavello,

22   David Sorensen, Ellen Noteware, Jessica MacAuley, Joe

23   Meltzer, Kristen Johnson, Peter Kohn -- I believe

24   that's it, your Honor.

25        THE COURT:  Okay.  Thank you.

1          MR. BUCHMAN:  Good morning, your Honor.  Michael

2     M. Buchman for the end-payor and third-party payor

3     plaintiffs.  And with me this morning are Marvin Miller

4     and Steve Shadowen and Sharon Robertson, who are all

5     court-appointed co-lead counsel, as well as Bob

6     McConnell from our Providence office who is liaison

7     counsel on behalf of the end-payor plaintiffs.  Thank

8     you, your Honor.

9          THE COURT:  Okay.  Thank you.

10          MR. PACE:  Good morning, your Honor.  Jack Pace

11     here from White & Case on behalf the Warner and Watson

12     defendants.  And I'm joined here today by Mark Gidley,

13     also of White & Case, and Nicole Benjamin from Adler,

14     Pollack & Sheehan.

15          THE COURT:  Okay.  Thank you.  Anyone else?

16     Okay.  Very good.

17          So I've read your papers, and I've reviewed the

18     proposed orders that have been submitted, and you've

19     revised those -- some of those have been revised -- in

20     response to some requests that we made of you.  I think

21     I'll turn it over beginning with the direct purchasers

22     plaintiffs and then the other plaintiffs, make your

23     presentation, and then I'll hear anything that the

24     defendants wish to say about it.

25          So Mr. Sobol, we can start with you.

1          MR. SOBOL:  Well, first, thank you very much,

2    your Honor.  I very much appreciate the opportunity to

3    be before you again.  I do wish it was in person.  I

4    did enjoy the times that we got a chance to be there,

5    even though I didn't always like what you were doing to

6    us but, nevertheless, I appreciate very much the

7    opportunity to be back before you.

8          And without trying in any way to curry favor in

9    any way, your Honor, I think it's very important to say

10   for, frankly, all counsel -- and I'm not trying to

11   grandstand -- this Court spend an enormous amount of

12   time, you and your staff, the law clerks, the court

13   personnel, spent a huge amount of time on this matter.

14   There were jurors that spent -- took times out of their

15   lives in the few precious weeks before the COVID crisis

16   began.  And we really do very much appreciate that

17   very, very much.  I think that's just important to say

18   at the outset.  I will not be long, but I do think that

19   it's important for me to create a record on the

20   relative points, even though you do have all the

21   materials that are necessary before you, to state the

22   following in connection with our motion.

23          First, there are four things we're really asking

24   you to do here.  We're asking you to find that the

25   settlement notice was constitutional and adequate.

1    That the settlement of the direct purchaser case was

2    fair and reasonable.  That the proposed allocation plan

3    is fair and reasonable.  And to adopt the magistrate

4    judge's proposal, report and recommendation, which

5    itself dealt with three things; the class fee, the

6    class expenses and the award to Ahold as a class

7    representative.

8         On the first of those, I think that the papers

9    will speak for themselves.  We have a class that we

10   actually know the names of the entities.  They were

11   sent notice by first-class mail.  They also got emails.

12   To the extent that it wasn't a hit in either of those

13   regards, the class administrator followed up.  I don't

14   think that's in any way controversial.

15        Turning to the second issue, your Honor, which

16   is the fairness of the proposed settlement, whether

17   one's looking at the *Grinnell* factors or looking at the

18   factors under Rule 23(e), my approach on these things

19   is to categorize the considerations into two buckets;

20   what are the procedural considerations and what are the

21   substantive considerations.

22        Here, the procedural considerations warrant a

23   conclusion of fairness.  Procedural, obviously,

24   warrants an inference of fairness of certain kinds of

25   processes.  That's why I put it in the terms of the

1    procedural consideration.

2         Here, the settlement was achieved after all

3    discovery on the eve of trial so that people know that

4    procedurally all of the issues have been vetted.  The

5    plaintiffs' lawyers and the defendants' lawyers were

6    competent.  I won't say anything more about that.  We

7    did have an experienced mediator that was involved in

8    the process.

9         The Court itself was deeply knowledgeable about

10   the issues; not just because it presided on it,

11   obviously, but because you had dug into issues twice on

12   12(b)(6)es in class certification on two different

13   groups, summary judgment hearings, *Daubert* hearings,

14   motions in limine, so that procedurally is adequate.

15   The First Circuit had also reviewed the case a couple

16   of times, at least for our case; first, on a 12(b)(6)

17   and also on our class certification.

18        Now, I'm mindful, because I've read one of your

19   decisions, that you sort of look at these tests, you

20   run through a list, these laundry lists tend to be sort

21   of self-serving, right?  So if you just pick the ones

22   that are, you know, supporting your position or

23   whatever, it's sort of defining the result.  So I did a

24   mental exercise in preparing for this, which is, okay,

25   can I honestly define a procedural aspect here which

1   might not support or might even cut away from a

2   conclusion that the settlement is fair and reasonable?

3   And I honestly couldn't think of a procedural -- I'll

4   turn to the substantive in a moment -- but I couldn't

5   think of a procedural circumstance here that might give

6   the Court cause, at least for the direct purchaser

7   side, because you also know that all of the direct

8   purchasers got actual notice because we know exactly

9   who they are -- they're all sophisticated because they

10  are in the business of buying and selling drugs -- and

11  therefore -- and none of them objected.  So I couldn't

12  identify any procedural issue which would cut against

13  the issue of the conclusion of fairness.

14          So then turning to the issue of substantive

15  fairness and reasonableness of the settlement.  A

16  couple of obvious points that are in our papers, but

17  then I'll turn to the more interesting mental exercise.

18  Factually and legally, this case was highly complex;

19  even for a reverse-payment case, this was highly

20  complex.  You know, our best, if you will,

21  reverse-payment cases are the simpler you can possibly

22  get it.  But for reasons that were needed in this case,

23  this was a complicated reverse-payment case and

24  generic-delay case.  We had a fraud on the market

25  theory.  We had a sham-litigation theory.  The tests

1    under both of those theories is obviously very

2    difficult given the Noerr-Pennington requirements of

3    overcoming that.

4         The reverse-payment case here was not just one

5    kind of a reverse payment; it was a hybrid, if you

6    will, no AG, other side deals, each one of them with

7    its own additional level of complexity and needed to

8    bring in certain kinds of experts.

9         And then the issues of causation become even all

10   the more complicated because you've got these three or

11   four different kinds of liability theories that having

12   to show what difference that made and, obviously,

13   depending upon what you show by way of liability,

14   that's going to change the way that you have to

15   construct what the circumstances would have been in a

16   competitive situation.  So that was complicated.  And

17   the damages that are also complicated, because the

18   damages have to have these multiple, different

19   scenarios depending upon the way that the liability all

20   cuts out, so it was a very complicated case.

21        We had some risks on market power.  You know

22   that issue more than probably any other issue because

23   you waffled on it, your Honor, frankly.  No disrespect

24   intended but, frankly, I think that's the -- it goes to

25   show how deep the Court was thinking about those

1    issues, frankly.

2          THE COURT:  I don't know if I would use the term

3    "waffled," but my view did shift, I will say.

4          MR. SOBOL:  Fair enough.  Fair enough.  Well, I

5    didn't use "flip-flop," your Honor, that was another

6    option I could have done, but in any event.

7          What I will say about market power, your Honor,

8    is that I do believe legally that in these cases the

9    plaintiff should get summary judgment.  I just think

10   that the brand-generic marketplace is a situation where

11   we should get summary judgment.  But I also

12   recognize -- and I told this to the lawyers at White &

13   Case -- that if we end up in front of a jury, this is

14   the kind of jury that you can unfortunately try -- this

15   is the kind of situation or issue in front of the jury

16   where you really can potentially confuse them out of

17   something that they ought not be confused about.  So it

18   is a real risk that we had, even though I candidly, as

19   a litigant -- as an adversary in these cases -- don't

20   think it should be a fair one.

21         And one way of looking at this case also in

22   terms of just the dollars so the class -- the gross

23   settlement amount of $120 million, as our papers

24   indicate, depending on how you look at our single

25   damages, is in a range of about 18 percent to about 80

1    percent of the single damages.  And according to the

2    case law that we've been able to see, cited in footnote

3    85 of our brief, that's in the range of what you see is

4    reasonable antitrust results.

5          So there are two I think -- I did the same

6    mental exercise and said, okay, Sobol, you had an

7    interesting laundry list there, but what are the things

8    that cut against the substantive question of fairness

9    and reasonableness?  And I came up with two.  The first

10   one is disclosed in our papers.

11         The defendants have more money than this to pay

12   a judgment.  They're not the deepest pocket, but they

13   are a deep pocket and we did not confront the immediate

14   risks of inability to pay.  But as our papers also

15   showed, that really is just a neutral factor in cases

16   like this when you have a deep pocket.  But that was

17   one thing that cuts against a conclusion of

18   reasonableness.  I don't think it gets us anywhere

19   here.

20         The other one is I think just more like an

21   intellectual observation than anything else, but it is

22   the case that antitrust cases tend to settle for less

23   than single damages.  But antitrust cases, at least

24   from the direct purchasers side, have a federal statute

25   that has a mandatory treble damage award.  And there's

1    a conundrum observed in the academic paper that we

2    cited at page 85 of our memo that, basically, one

3    scratches one's head which is why the cases settle for

4    less when you've got a treble damage award that's out

5    there.  So I think that's an observation that might cut

6    against the question of reasonableness.

7         I do think, though, obviously, in the end -- and

8    I don't think this is terribly controversial, but I do

9    think that, again, we have to make this record to

10   you -- that a $120 million settlement, when you compare

11   this to all the other generic suppression cases, it's

12   not the largest one, but it's on the larger side of the

13   other settlements, and I think what ultimately drives

14   it is the reality that these cases are really quite

15   complex.  And having tried one of them, I know that

16   they're also quite difficult to try because the jury is

17   being asked to absorb a huge amount of different kinds

18   of information, whether it's the details of the patent

19   merits or how the industry works with, you know,

20   generic entry into the market, causation issues about

21   the ability to get to market, manufacturing.

22        There are just so many different kinds of

23   issues.  Medical issues about, you know, the type of

24   product and how that product competes against others.

25   You sort of just swim at some point with the

1    complexity.  And I think that that's one of the reasons

2    why this is a very good settlement because this case

3    was much more complex than the others and yet we're

4    settling at a level that's higher than most of the

5    other cases.  So that's what I'll address on the issue

6    of the fairness and the reasonableness of it.

7            I'll turn now to the plan of allocation which

8    really -- again, I don't think this is terribly

9    controversial, but just so you know, the plan of

10   allocation for the direct purchasers will be

11   straightforward but evolved.  We made sure that we get

12   apples-to-apples data from each of the class

13   representatives.  We don't just look at unit sales; we

14   actually look at purchases.  We draw distinctions

15   between brand and generic purchases in order to make

16   sure that differently affected members of the class are

17   treated reasonably, which they are here.

18           Typically, in these cases, it does not end up

19   being controversial, but it is involved.  Sometimes

20   there are issues of making sure we're talking about

21   apples to apples when we have to address issues, for

22   instance, like returns and how accounting is kept with

23   with respect to that.  But at bottom, it's a very

24   straightforward process made easy by the fact, again,

25   that we know who they are and they are in a position to

1    be able to provide us with correct data.

2           So putting that aside then, turn to the issue of

3    seeking to have the Court adopt Magistrate Judge

4    Sullivan's report and recommendation.  The expenses in

5    this case are quite similar to expenses that we've seen

6    in other cases.  The expense request of about $3.9

7    million, about two-thirds of that is experts, maybe

8    even somewhat more than that, two-thirds is just

9    experts.  Again, that's consistent with what we've seen

10   in other cases.  The documentation is there.

11          Let me then turn to the Ahold request for a

12   hundred-thousand dollars.  I do think it's important

13   for class representation in this case, I think it is

14   important that we observe that Ahold, a large company,

15   not only stuck with the case, but it stuck with the

16   case even though there were other class representatives

17   who, for good reasons, needed to not stick with the

18   case till the end.  Ahold did.  It served the class

19   well and therefore should be able to receive a

20   hundred-thousand dollars for that effort.  It did put

21   in time and energy -- not money, but time and energy

22   into its class-representative duties.

23          And the final issue with respect to attorneys'

24   fees, several things.  The report and recommendation

25   follows the memo that we provided and so I don't need

1    to go into all of those issues.  What I do want to

2    focus in on is, for these purposes, the conundrum, if

3    you will, that you've observed in some of your other

4    cases which is why look at a laundry list?  Shouldn't

5    there be a more rigorous way approach looking at a fee

6    request in these circumstance, and is there a more

7    market-driven approach way to be able to look at these

8    cases?

9          And I think that there's some real merit to

10   those kinds of observations, frankly.  I think when you

11   apply that kind of market-driven rigor to what you see

12   in the materials we filed before you is that, in this

13   market, with a class counsel who we have effectively

14   our own R&D departments because we have to actually

15   research and develop the cases in order to get them

16   filed and we take on the vast vault of the work that

17   ends up being done in direct purchaser cases, even if

18   there are other groups like the retailers that come

19   along and don't have R&D departments, that when you

20   look at what the jurists have done in looking at these

21   cases, even though after the fact, as a practical

22   matter, the uniformity -- because we did not

23   cherry-pick results when we provided these charts to

24   you, right -- again, that was another teaching that you

25   had from one of your cases, don't give me a chart of

1    the cases that just support your position, give me the

2    chart that's like actually empirical analysis of what's

3    happened elsewhere.

4        That empirical analysis shows that, you know,

5    it's a third.  When it's not a third, it's such a clear

6    outlier like *Paxil* where the lodestar is less than a

7    million, the result's a hundred-million dollars, what

8    do you do in that situation?  It's just an absolute

9    outlier, Other outliers like that, *Provigil*, the total

10   being 512 or something million in that order, something

11   like that.  It's not a clear outlier, this market for

12   this little cottage industry for class counsel is a

13   third.

14       So with that, unless the Court has any

15   questions, I think those are the highlights that I

16   wanted to provide to you on the papers.

17       THE COURT:  No, I don't really have any

18   questions.  I'm not aware of any court -- maybe you can

19   tell me if there is -- any court that's attempted to

20   apply a more market-based approach to the fees along

21   the lines of what I've done or tried to do a bunch of

22   years ago in that security case.  Has anyone tried to

23   do that in one of these cases?

24       MR. SOBOL:  No, no one has tried to do that in

25   these cases.  Candidly, it's more like the grocery-list

1    approach and then a look at what's happened in other

2    cases.  You know, there is again -- I mean, I'm going

3    to take the bait on this, your Honor, because I

4    actually do think about these issues and I probably

5    shouldn't take the bait, but let me just say, right, my

6    little hint about an R&D department, right, is that I'm

7    aware that there's also some direct purchaser lawyers

8    out there who get hired to represent opt-outs, right.

9    And it would be an intriguing, but difficult to

10   undertake, empirical inquiry into what the rates are

11   being charged there, what the class lawyers end up

12   charging.  How much time and energy is being put in on

13   each side and, therefore, whether or not the opt-out

14   counsel effectively have a market-driven rate that's

15   actually higher than the class lawyers.

16        THE COURT:  Right.

17        MR. SOBOL:  That would be -- if one wanted to do

18   it, that's how you would have to go about doing it.

19   But, of course, you'd have to figure out some way to

20   get behind the private confidential agreements that the

21   opt-out counsel have, right.

22        But in reading your decision, I'm very intrigued

23   by, frankly, the market-driven approach.  I've been

24   involved in a lot of these battles from tobacco and on

25   where that was a big part of the question.  Same issue

1    is going to be involved in opioids, that kind of thing.

2         So I think empirically that's what you have to

3    do, but I don't know how you go about doing it.  So

4    there we go; I took the bait.  Probably shouldn't have.

5         THE COURT:  It's very hard to it did post hoc,

6    that's for sure.

7         MR. SOBOL:  Yes.

8         THE COURT:  Okay.  No, I really don't have any

9    further questions.  I think you've made a comprehensive

10   presentation both on paper and in what you've just

11   presented.  So I'll leave it there, and we can turn it

12   over to, I guess, the EPPs.

13        MR. BUCHMAN:  Good morning, your Honor.  Michael

14   Buchman for the end-payor and third-party payor

15   plaintiffs.  I would echo the gratitude that Mr. Sobol

16   conveyed.  We are very thankful and appreciative for

17   all the efforts of the Court over the past seven years

18   and three months in connection with this litigation.

19   And we hope that your Honor's family and you are

20   healthy and safe, as well as the Court staff and

21   Magistrate Judge Sullivan.  We hope all is well.

22        Having said that, we are here today on

23   plaintiffs' motion for final approval of the notice

24   settlement, plan of allocation, and we are also

25   requesting in connection with this motion that the

1    Court affirm and adopt Magistrate Judge Sullivan's

2    report and recommendation on plaintiffs' motion for

3    attorneys' fees, costs, expenses and service awards to

4    the class representative.

5         Plaintiffs -- Mr. Sobol didn't go into a

6    detailed history of the litigation.  I don't feel it's

7    necessary because we, as end payors, had a joint

8    declaration in connection with our motion for approval

9    of attorneys' fees outlining the detailed history of

10   litigation, and Magistrate Judge Sullivan, in her

11   report and recommendation, also had a very extensive

12   history of the litigation, so we won't go over ground

13   that's been covered.

14        But we do want to briefly mention that there are

15   a few distinctions with regard to our case, and we

16   would adopt what Mr. Sobol has said in connection with

17   the issues on final approval wholeheartedly, but we do

18   have a couple of distinctions to make.  The first

19   being, your Honor, that the Lupin settlement -- the

20   direct purchasers did not sue Lupin.  The Lupin

21   settlement that we achieved was in conjunction with

22   discussions that we had with Lupin's counsel, along

23   with the retailer plaintiffs.  That settlement for a

24   million dollars was achieved during the

25   class-certification phase of the proceeding.  And that

1    settlement was negotiated over an extensive period of

2    time at arm's length with counsel for Lupin and the

3    retailers at a time where it was a highly controversial

4    case and we were litigating our claims aggressively.

5          The other point to make is that the directs and

6    the retailers settled their claims with regard to

7    Warner Chilcott earlier than the end-payor plaintiffs

8    and the third-party payor plaintiffs.  Our case against

9    Warner Chilcott, as the Court may be aware, settled the

10   morning of January 3rd, that Friday of our last

11   pretrial conference.  That settlement was achieved with

12   the assistance of two mediators, Layne Phillips and

13   David Murphy, both of ADR Resolution.  That settlement

14   was achieved in the morning of the final pretrial

15   conference, the last business day before trial.  And

16   after the case settled, the Court requested that we

17   retire and paper a memorandum of understanding, which

18   we did, and we returned to the Court that afternoon

19   with the memorandum of understanding outlining the

20   terms of the settlement.  So those are slight

21   distinctions between our case and the direct purchaser

22   case.

23          I would like to note, your Honor, that there is

24   an issue on final approval that the Court might

25   consider as a factor, that being how this settlement

has been received by the class members.  This

settlement has received no objections, that we are

aware of.  There was one request for an opt-out, Health

Care Services Corporation which, your Honor may recall,

requested to opt out and then decided they didn't want

to opt out; they actually wanted to participate in the

class, in the settlement.  And your Honor recently

approved them coming back into the class earlier this

week.  So we believe that that is an important factor

for the Court to consider in connection with final

approval, that being how well received the settlement

was by class members.

Under Rule 23, the Court may approve a proposed

settlement if it's fair, reasonable and adequate.  The

ultimate decision by the Court involves balancing the

advantages and disadvantages of the proposed settlement

as against the consequences of going to trial or other

possible, but perhaps unattainable, variations on the

proposed settlement.  And district courts have wide

discretion whether to approve a proposed settlement,

especially if the parties have negotiated at arm's

length, conducted sufficient discovery, the Court may

presume or must presume that the settlement is fair,

reasonable and adequate.  And that's the case here.

District courts have weighed numbers of other

1    factors, including the reaction of the class to the

2    settlement, the complexity, expense and duration of a

3    trial, the risks in establishing liability and damages

4    and maintaining a class action through trial and the

5    range of reasonableness of the settlement in light of

6    the best possible recovery and the attendant risks of

7    litigation.  So first let me address whether the

8    parties engaged in arm's-length, good-faith

9    negotiation.

10        I just mentioned with regard to the Lupin

11   settlement for a million dollars that that was

12   conducted during litigation with Lupin's counsel at

13   arm's length.  That was not achieved with the

14   assistance of a mediator, unlike the third-party payor

15   settlement which was achieved with the assistance of a

16   mediator, and that was reached the last business day

17   before trial which afforded class counsel at that time

18   a full opportunity to weigh the risks and rewards of

19   proceeding to trial against Warner Chilcott.

20        So I can't imagine a better situation than

21   having a full record where there were millions of pages

22   of documents produced to plaintiffs, there were a

23   hundred depositions, there were 51 motions in limine.

24   This discovery was extensive in this case, and it was

25   hotly contested on market-power issues.

1          At the time that the Warner Chilcott settlement

2     was reached, we were well apprised of all the risks and

3     rewards of proceeding.  And with regard to the Lupin

4     settlement in 2019, we were similarly well versed in

5     the risks and rewards of proceeding as to Lupin.

6          Another factor that courts consider is the risk,

7     expense and duration of continued litigation.  You

8     know, Mr. Sobol has just outlined the risks that were

9     involved in this litigation as to liability.  This was

10    a highly complex case involving issues at the

11    intersection of antitrust, patent, antitrust economics,

12    pharmaceutical regulation and causation issues,

13    specifically in this case.  Plus, with regard to our

14    specific case, we had state laws of approximately 26 or

15    more states that added additional complexity to the

16    case.

17          Now, with regard to damages, our case was even

18    more complex than the directs in terms of establishing

19    damages because it would have been a second damages

20    phase of the trial which would have required us, at

21    considerable expense, to go out and subpoena the PBMs,

22    get data produced from them and to work on that data to

23    establish damages in connection with the case.  So we

24    believe that the risks associated and the expense

25    associated with proceeding with this case were great.

1          Again, the other point to make, has the

2     settlement been well received, I've covered that.  The

3     issue here is whether or not there have been any

4     objections.  We're not aware of any.  There was one

5     opt-out; they wished to come back into the case and

6     they now have.  We believe that's a favorable factor

7     highly supporting approval of the case.

8          The other aspect that the Court can consider is

9     the experience of class counsel and whether class

10    counsel supports this case.  Now, co-lead counsel in

11    this case for the end payors have two decades of

12    experience litigating these cases.  We have been doing

13    these cases well before the *Actavis* decision came down,

14    and we've had success and we've had losses.  We've had

15    losses in cases like *Cipro* and *Tamoxifen*.

16          We are very well versed in these types of cases

17    and the issues and what we believe is a fair,

18    reasonable and adequate settlement.  And we've brought

19    this case to your Honor because, based on our

20    experience, we believe this is a fair, reasonable and

21    adequate settlement.

22          In addition, I would note that in Magistrate

23    Judge Sullivan's report and recommendation, she

24    referred to counsel for the end-payor plaintiffs as

25    well versed and experienced.  She said, "I find that

1    the work of EPP's counsel resulted in the Warner

2    Chilcott Settlement Fund, which confers a very

3    substantial benefit on potentially 40,000 members on

4    the TPP class.  While not directly pertinent, I also

5    find that EPP counsel litigated persistently,

6    aggressively and with great skill on behalf of the

7    consumer class, but achieved only limited success, that

8    being the Lupin settlement, based on which they are

9    requesting no fees.  I further find that EPP counsel

10   have demonstrated that they are skillful and

11   well-experienced and that they have effectively and

12   efficiently prosecuted this complex and protracted

13   litigation to the benefit of the EPP class.  Their work

14   arced over almost seven years in this court, ongoing

15   for a total close to eight years, with EPP counsel

16   achieving ultimate and hard-fought success in

17   establishing the legal viability of the EPP claims in

18   one of the first cases following *Actavis*, in overcoming

19   the challenge of *Asacol,* in achieving certification of

20   the TPP class, and in continuing the fight to the brink

21   of trial, including full-blown trial preparation for a

22   solo trial while other plaintiffs settled."  That's

23   Magistrate Judge Sullivan on the report and

24   recommendation.  So for all of reasons that I've

25   articulated, we would respectively submit that the

1    notice and that the Lupin million-dollar settlement and

2    the Warner Chilcott $62.5 million settlement should be

3    finally approved by the Court.

4          Now, with regard to the plan of -- at this

5    point, does your Honor have any questions on those

6    settlements?

7          THE COURT:  No, no questions.

8          MR. BUCHMAN:  Okay.  Thank you, your Honor.

9          With regard to the plan of allocation, we

10   believe it is also fair, reasonable and adequate.  All

11   that is required is a rational basis for the

12   allocation.  The allocation in this case was conducted

13   by plaintiffs' economist Dr. Gary French of Nathan

14   Associates.  It did a detailed analysis and came up

15   with a breakdown between the consumers and the

16   third-party payors, with the consumers being 30.03

17   percent and the TPPs being 69.97 percent.

18         Now, with regard to the Lupin settlement

19   specifically, we determined, in connection with that

20   settlement at the time that it was arrived at, that the

21   expenses in the litigation were approximately

22   $2,345,000.  So applying that 33.03 percent

23   differentiation, the expenses allocable to the

24   consumers was $704,209, plus there was the additional

25   cost of a robust notice publication that was necessary

1    to the consumers as part of the Lupin settlement, a

2    significant portion of the $354,000 notice was directly

3    attributable to the consumers.  And, therefore, we

4    believe that that money from the million-dollar Lupin

5    settlement should pour over into the Warner Chilcott

6    settlement.

7         With regard to attorneys' fees, reimbursement of

8    expenses and service awards, it's worth noting that

9    your Honor, at the beginning of this case, assigned

10   Magistrate Judge Sullivan the task to oversee quarterly

11   time and expense reports.  She routinely reviewed our

12   time and expense reports.  She held conferences with

13   counsel to discuss her findings with regard to those

14   reports.  And we implemented, in accordance with her

15   direction and findings, those changes.  So our time and

16   expenses were monitored in this case from the outset.

17        And for that reason we believe that your Honor

18   requested that she address our motion for attorneys'

19   fees, costs and expenses and service awards given her

20   intimate familiarity with the issues that were raised.

21   She re-reviewed our time and issued a report and

22   recommendation to your Honor that we are asking that

23   you adopt and affirm for fees of $20,833,333.33 and

24   litigation expenses of $3,995,995.58 plus $90,000 in

25   incentive awards to the class-representative plaintiffs

1    who went through the rigors of discovery, they produced

2    documents in connection with defendants' document

3    requests and sat for depositions and were prepared,

4    like the city of Providence, to attend trial and

5    testify in this case.

6         With regard to notice, notice must be reasonable

7    in manner to all class members.  It should reach them

8    in a reasonable way to inform them of the settlement

9    and give them an opportunity to object.  Again, we've

10   received no objections in connection with this case.

11        With regard to notice, there were two different

12   types of notice.  There was mailed notice directly to

13   third-party payor clients, that we're aware of.  There

14   were 40,000 of those individuals.  This is laid out in

15   the declaration of Eric Miller.  There was also

16   publication notice which consisted of various forms.

17   There was a one-third summary of the notice in *People*

18   *Magazine* in May of this year.  There was a PRNEWS flyer

19   press release that was issued.  There were news feed

20   announcements on Facebook and Instagram.  And there

21   were 157 million targeted press releases on select

22   websites such as ThinkAdvisor and Light Health.  And

23   there were additional banner advisements on the

24   internet.

25        So for these reasons, we believe, and for the

1    reasons articulated in Eric Miller's declaration, we

2    believe that the class received more than adequate

3    notice concerning the settlement in this case.  For all

4    these reasons and for the reasons articulated by Mr.

5    Sobol, we respectfully request that the Court approve

6    the Lupin and Warner Chilcott settlements, adopt the

7    plan of allocation and affirm and adopt Magistrate

8    Judge Sullivan's report and recommendation on our

9    motion for fees, costs, expenses and service awards to

10   the class representatives.

11        Two proposed orders have been presented to your

12   Honor for review and signature, if this settlement

13   meets with your approval.  Unless the Court has any

14   further questions, we rest on our papers.

15        THE COURT:  No.  I think you've covered

16   everything, Mr. Buchman.  Thank you.

17        MR. BUCHMAN:  Thank you, your Honor.

18        THE COURT:  All right.  I think it was --

19   Mr. Pace, are you going to be speaking on behalf of

20   Warner Chilcott?

21        MR. PACE:  Yes, your Honor.

22        THE COURT:  Okay.

23        MR. PACE:  And good morning, your Honor.  And

24   very briefly, I'll join, first of all, on behalf of all

25   the firms representing the defendants in the case and

1    the defendants themselves, we join in the sentiment

2    expressed by the plaintiffs, that it really was a

3    privilege and honor to appear before your Honor and all

4    the court staff.  And we thank the Court in particular

5    for the extensive time it took, extensive hearings and

6    really giving the parties an opportunity to be heard on

7    all the various issues in this complex case.

8           Briefly, I think there are probably two of the

9    Grinnell factors that a defendant might have a view on

10   and factor 8, reasonableness of the settlement in light

11   of the best possible recovery, worst possible damages

12   of a defendant, or factor 9, reasonableness of the

13   settlements in light of all the attendant risks of the

14   litigation for all the parties.  And those we feel

15   strongly, certainly, support the class settlements

16   here.

17          This case was unique in, among other reasons,

18   really presenting at least three cases in one;

19   patent-fraud and sham-litigation case, reverse-payment

20   case, product-hopping case.  And reverse payment alone

21   is an area in which it seems like most of the issues

22   are still not entirely settled and therefore create

23   great risks for the parties.  The Supreme Court, as we

24   all know, has really pushed the issues and the analysis

25   down to the district courts to figure it out and that,

1    the nature of that dynamic, really does create risks

2    for everybody.

3           Each one of these three theories while, as Mr.

4    Sobol pointed out and is evident across the papers,

5    create really high burdens for the plaintiffs to carry

6    at trial, they also translate, essentially, into at

7    least three different ways the plaintiffs can win at

8    trial and that creates a lot of risk and in this case

9    translated to potential damages in the several billions

10   of dollars.

11          So for those reasons, we think the settlements

12   are reasonable.  We support approval of both sets of

13   class settlements.  And defendants, though, take no

14   position on the award of attorneys' fees or plan of

15   allocation.  Thank you, your Honor.

16          THE COURT:  Okay.  Thank you.  Is there anyone

17   else that we need to hear from?

18          MR. SOBOL:  Your Honor, if I may then?

19          THE COURT:  Sure.

20          MR. SOBOL:  In case I did not make special

21   mention of Magistrate Judge Sullivan, I do wish to.

22   She also paid an enormous amount of attention to this

23   case.  She met with us on the direct purchaser side

24   quarterly.  She established a protocol here that really

25   translates quite seamlessly, frankly, in terms of

1    giving the Article III judge a record upon which to

2    make a judgment like this that otherwise might be

3    somewhat unwieldy, that kind of thing.  My colleagues

4    wanted to make sure that I do a special callout for the

5    magistrate judge.  Thank you.

6         THE COURT:  Okay.  Thank you.

7         Well, I think I've heard from everyone who needs

8    to be heard from.  And I'm going to keep my comments

9    very brief I think because I think you have really

10   covered everything that needs to be covered in terms of

11   what the standards are, what the findings need to be,

12   and I really don't disagree with any of the arguments

13   and analysis that you've presented.  I, essentially,

14   agree with it all and I adopt them.  So I think I'm

15   just going to say a few things more extemporaneously

16   rather than extremely formally.

17        I think I'll start just generally, in terms of

18   speaking about the fairness and the reasonableness and

19   the adequacy of the settlement, to just emphasize a few

20   points that you all have made from my perspective

21   looking at the settlement from the standpoint of having

22   presided over this case for, I think you've said it was

23   seven years; sometimes it seems like it was an eternity

24   and not seven years.  It was really I think one of the

25   most complex, maybe the most complex case, that I've

1  had in my career on the bench, which is, you know, not

2  quite 20 years.

3       As you've outlined, its complexity was layered

4  and informed really by decisions that were being made

5  in the Supreme Court and the First Circuit in realtime,

6  and you all were having to deal with, particularly

7  *Asacol*, and we were having to deal with a shifting

8  legal landscape that made an already very complex case

9  even more difficult.  So I don't think you can

10  overstate the degree of complexity of the litigation

11  and really the uncertainty of the legal landscape that

12  we were all working in.

13       The degree to which you all litigated the case

14  is -- you know, I can't imagine attorneys litigating a

15  case more rigorously than you all did in this case.  It

16  seems like every conceivable, legitimate, substantive

17  dispute that could have been fought over was fought

18  over to the max.  So you, both sides, I think litigated

19  the case as vigorously as any group of attorneys could.

20       The level of representation of all parties in

21  terms of the sophistication of counsel, was, in my

22  view, of the highest levels.  I can't imagine a case in

23  which there was really a higher quality of

24  representation across the board than this one.  It was

25  enormously challenging for us in my chambers to keep up

1    with the dozens and dozens of lawyers that you

2    continued to throw at the case even as

3    we -- particularly as we approached the eve of trial.

4    So to the extent -- and I think it's important that the

5    level of the litigation, the sophistication of counsel,

6    and the sophistication of the parties that you

7    represented, all of these things suggest the

8    reasonableness of the settlement.

9            I think Mr. Buchman noted that there were a

10   hundred depositions in the case.  I'd forgotten just

11   how many there were.  Both of you mentioned the motions

12   in limine and the substantive motions to dismiss and

13   the *Daubert* motions.  And I would say that it can't be

14   understated how substantive those motions in limine

15   were.  So again, it speaks to the amount of effort that

16   was put into the case running right up to trial, how

17   vigorously you litigated the pretrial issues and how

18   much work it was, frankly, to deal with those motions

19   in limine.  And of course, you both mentioned the

20   market-power issue, which may go down in my own

21   personal history as the issue I have struggled with in

22   more ways than you can imagine internally, more than

23   just about any other.  And I think that suggests just

24   how difficult the whole market-power issue is in this

25   area of antitrust.

1     You both spoke to the amount of risk, and I

2     think that -- I'm no expert on this, but I think that

3     you do have the expertise to analyze the risk, and I

4     think what you presented in your papers suggests that

5     the settlements are reasonable in light of the risks

6     involved on both the low side, which I think could have

7     been the plaintiffs got nothing out of this trial, to

8     the high side, which could have been in the billions of

9     dollars.  So I think the risk has been accurately

10    assessed by you, your clients and your experts and by

11    the mediators.

12    And that I think is another indicator of the

13    reasonableness of the settlement is the sophistication

14    of the mediators that you had working on this case.

15    I've looked at the background of the mediators; you've

16    presented information about them.  I think that they're

17    probably the leading mediators in this field in the

18    country.  And the fact that they were so involved right

19    up to the end in helping you reach a resolution, again,

20    suggests the reasonableness.

21    The fact that there are no objections to the

22    settlement on any side is I think really important, and

23    I think the notice has been comprehensive here.  As

24    both parties have suggested, a lot of the -- at least

25    on the DPP side, all of the -- really, on both sides,

1    the parties are known, and there hasn't been any

2    objection other than the one -- or the one opt-out was

3    not really an objection, but then they opted back in,

4    so I think that suggests the reasonableness of the

5    settlement.  So across the board it seems to me that

6    the factors of Rule 23 are well met in this case.

7         That brings me to the plan of allocation and the

8    attorneys' fees.  The plan of allocation seems

9    reasonable to me, supported by experts and notice

10   is -- we've discussed, I think, is adequate.

11        Now, on the attorneys' fees, I'm going to adopt

12   the report and recommendation of Judge Sullivan.  And I

13   think what she says in her report and recommendation

14   really says all that needs to be said, in addition to

15   the comments I've just made, about the work that all of

16   you have done in this case.  I think Mr. Sobol said

17   that this is -- even if one were to take a market-based

18   approach to evaluating the attorneys' fees, we'd still

19   end up in the same place at one-third.

20        I don't know if that's true -- that doesn't seem

21   unreasonable to me, it might well be true -- but I

22   think in this case I can't imagine trying to figure out

23   how to do a post-op market-based approach to this.  But

24   I think what's more important is that we set up a

25   process in this case that looking back on it makes me

1   feel very good about approving the attorneys' fees, and

2   that's what we have Judge Sullivan overseeing and

3   meeting with you quarterly about the fees.  And that

4   was something that Judge Sullivan and I came up with

5   very early on, as you know, in the case, and I know

6   that it seemed like a burden perhaps at some points

7   where you had to go through that process with her, but

8   I think in the end it makes your case stronger for this

9   fee request, and it makes our job not just easier, but

10  I think we can feel better about approving the fee

11  request where that work was put in during the course of

12  the litigation.

13         I've had the chance to speak with Judge Sullivan

14  about this, and she has told me that I think others

15  have sort of looked at what was done in this case and

16  considered it to be a model that should be replicated

17  in other cases, even though it's kind of a pain, and so

18  I think in the future, you know, imitation is the

19  greatest form of flattery, so maybe if that's the case,

20  maybe it really is sort of proving up the merit of the

21  process that we adopted.

22         So I do want to publicly, as part of this

23  proceeding, thank Judge Sullivan for the amount of time

24  and effort that she put into this case, particularly

25  with respect to the monitoring of the attorneys' fees,

1    but also in other respects.  It was a great advantage

2    for me to have her as a judicial partner in working on

3    this case.  And it's kind of a model I think for how

4    district judges and magistrate judges can work together

5    in these really complicated cases.  So I'm really

6    grateful to her for all the work that she did.

7         While you usually don't maybe see us do this

8    sort of thing, I can't overstate to you how helpful the

9    law clerks who worked on this case with me were to

10   helping me get through this in the way that we did.

11   They're on this conference, and their work on this was

12   just exemplary.  And I will tell you that it is really

13   something when it's just three of us against I don't

14   know how many of you there were in this case, but

15   dozens of you.  And we did feel at times that it just

16   wasn't fair that we were battling against all of you

17   and, as they would say, you know, you guys are just so

18   good, we don't know when you're trying to trick us and

19   when you're really giving it to us straight.  Anyway,

20   they did amazing work, and I'm really, really grateful

21   to them for what they did.

22        So with all of that, I'm going to approve the

23   settlements, and I'm going to adopt the report and

24   recommendation of Judge Sullivan with respect to the

25   attorneys' fees.  I've had you submit revised orders

1     that will set this forth on the record, and I'm going

2     to get those orders executed in the next couple of

3     days.  And I don't see the need for any further

4     revisions to those orders.  If you do, I'd like you to

5     let me know that.

6           All right.  I think that concludes what I want

7     to say here.  Is there anything else that we should

8     take up?

9           MR. BUCHMAN:  Your Honor, Michael Buchman.  I

10    believe there's one housekeeping matter with regard to

11    the two individual plaintiffs.  There's an entry of

12    judgment that needs to be so ordered in regard to those

13    settlements.

14          THE COURT:  Okay.

15          MR. BUCHMAN:  Thank you, your Honor.

16          THE COURT:  Okay.  We'll take care of that.

17    Anything else from the DPPs, Mr. Sobol?

18          MR. SOBOL:  No, your Honor.  Thank you very,

19    very much.  I hope you have a wonderful rest of the

20    summer.

21          THE COURT:  All right.  Thank you.

22          And anything from defendants, Mr. Pace?  Where

23    are you?

24          MR. PACE:  Right here, your Honor.

25          No, nothing else from the defendant.  Thank you.

1          THE COURT:  All right.  Very good.  Well, thank

2      you all.  Stay healthy, and maybe we'll see you again

3      sometime.

4              (Time noted; 11:05 a.m.)

5              (Proceedings adjourned)

1          I, Lisa Schwam, RPR-RMR-CRR, do hereby

2     certify that the foregoing transcript is a correct

3     transcript *of a remote video conference* prepared to the

4     best of my skill, knowledge and ability of the

5     proceedings in the above-entitled matter.

6

7     /S/ Lisa Schwam

8     Lisa Schwam, CRR-RPR-RMR          Date
      Federal Official Court Reporter   September 3, 2020
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25