# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE BYSTOLIC ANTITRUST LITIGATION | Lead Case No. 1:20-cv-05735-LJL |
| This Document Relates to: <br><br> All End-Payor Actions | |

# END-PAYOR PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE END-PAYOR PLAINTIFFS' SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

## **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

ARGUMENT ...................................................................................................................... 2

I.     EPPs' Complaint Is Adequately Pled Under *Actavis* ........................................... 2

II.    EPPs' Injunctive Relief Claim Is Not Moot ........................................................ 4

      A.    EPPs Sufficiently Allege the Need for a Reparative Injunction ............................ 5

      B.    EPPs Sufficiently Allege the Need for a Preventive Injunction ............................ 6

III.   EPPs Claims Are Timely ....................................................................................... 8

      A.    EPPs' Claims Are Timely Under the Normal Accrual Rule
           and Binding Precedent ........................................................................ 8

      B.    EPPs' Claims Are Also Timely Under the Continuing
           Violation Doctrine ............................................................................. 9

      C.    New York's Borrowing Statute Is Irrelevant ....................................... 14

IV.   EPPs' State Antitrust Claims Are All Viable ..................................................... 15

      A.    EPPs Allege Viable Antitrust Claims Under Illinois, Utah,
           Connecticut, Maryland, and Rhode Island Statutes ............................... 15

      B.    EPPs Have Established Standing in All States ..................................... 19

V.    EPPs' State Consumer-Protection Claims Are All Viable ................................. 21

      A.    EPPs Have Stated a Plausible Claim under California's UCL ............................ 22

      B.    EPPs Have Standing to Bring a Claim Under CUTPA ......................... 24

      C.    EPPs' Claims Under the Consumer Protection Laws of Idaho,
           Illinois, and Utah Reach Defendants' Anticompetitive Conduct .................. 25

      D.    EPPs Are "Consumers" ..................................................................... 27

      E.    EPPs Are Permitted to Bring Consumer Class Actions ........................ 29

CONCLUSION .................................................................................................................. 30

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Adkins v. Comcast Corp.*,
  2017 WL 3491973 (N.D. Cal. Aug. 1, 2017) .......................................................................23

*In re Aggrenox Antitrust Litig.*,
  94 F. Supp. 3d 224 (D. Conn. 2015)..............................................................................10, 18

*In re Aggrenox Antitrust Litig.*,
  2016 WL 4204478 (D. Conn. Aug. 9, 2016) ....................................................................6, 16

*Alden Mgmt. Servs., Inc. v. Chao*,
  532 F.3d 578 (7th Cir. 2008) ..............................................................................................12

*In re Asacol Antitrust Litig.*,
  907 F.3d 42 (1st Cir. 2018)..................................................................................................20

*In re Bayer Corp. Combination Aspirin Prods. Mktg. & Sales Pracs. Litig.*,
  701 F. Supp. 2d 356 (E.D.N.Y. 2010) ...........................................................................3, 4, 21

*Berkey Photo, Inc. v. Eastman Kodak Co.*,
  603 F.2d 263 (2d Cir. 1979)..................................................................................................9

*Berneike v. CitiMortgage, Inc.*,
  708 F.3d 1141 (10th Cir. 2013) ...........................................................................................26

*Broadway Theatre Corp. v. Buena Vista Pictures Distribution*,
  2002 WL 32502100 (D. Conn. Sept. 19, 2002)....................................................................24

*In re Broiler Chicken Antitrust Litig.*,
  290 F. Supp. 3d 772 (N.D. Ill. 2017) ..................................................................................16

*Brumfield v. Trader Joe's Co.*,
  2018 WL 4168956 (S.D.N.Y. Aug. 30, 2018).......................................................................23

*Bullard v. State*,
  307 A.D.2d 676 (N.Y. App. Div. 2003) ...............................................................................12

*California v. Am. Stores Co.*,
  495 U.S. 271, 110 S.Ct. 1853, 109 L.Ed.2d 240 (1990).........................................................5

*California v. ARC America Corp.*,
  490 U.S. 93 (1989).................................................................................................................1

*Cargill, Inc. v. Monfort of Colorado, Inc.*,
479 U.S. 104 (1986) ............................................................................................4, 5

*Carlie v. Morgan*,
922 P.2d 1 (Utah 1996) .............................................................................................26

*In re Cast Iron Soil Pipe & Fittings Antitrust Litig.*,
2015 WL 5166014 (E.D. Tenn. June 24, 2015) ........................................................28

*Centurion v. Holder*,
755 F.3d 115 (2d Cir. 2014) ......................................................................................18

*City of Rockford v. Mallinckrodt ARD, Inc.*,
360 F. Supp. 3d 730, 764 (N.D. Ill. 2019) ...............................................................17

*Clement v. St. Charles Nissan, Inc.*,
103 S.W.3d 898 (Mo. Ct. App. 2003) .......................................................................28

*CMG Holdings Grp. v. Wagner*,
2016 WL 4688865 (S.D.N.Y. Sept. 7, 2016) ............................................................23

*Commack Self-Serv. Kosher Meats Inc. v. State*,
270 A.D.2d 687 (N.Y. App. Div. 2000) ....................................................................12

*Crigger v. Fahnestock & Co.*,
2003 WL 22170607 (S.D.N.Y. Sept. 18, 2003) ........................................................23

*D'Eramo v. Smith*,
872 A.2d 408 (Conn. 2005) .......................................................................................19

*In re DDAVP Indirect Purchaser Antitrust Litig.*,
903 F. Supp. 2d 198 (S.D.N.Y. 2012) ..................................................................25, 26

*In re Dealer Mgmt. Sys. Antitrust Litig.*,
362 F. Supp. 3d 510 (N.D. Ill. 2019) ........................................................................16

*In re Digital Music Antitrust Litig.*,
812 F. Supp. 2d 390 (S.D.N.Y. 2011) .......................................................................16

*Doe v. Epic Games, Inc.*,
435 F. Supp. 3d 1024 (N.D. Cal. 2020) .....................................................................23

*In re Effexor Antitrust Litig.*,
357 F. Supp. 3d 363 (D.N.J. 2018) ............................................................................18

*Ellul v. Congregation of Christian Bros.*,
774 F.3d 791 (2d Cir. 2014) ........................................................................................8

*F.T.C. v. Actavis, Inc.*,
570 U.S. 136 (2013) ........................................................................................................7

*F.T.C. v. Mylan Labs, Inc.*,
62 F. Supp. 2d 25 (D.D.C.) ............................................................................................28

*Federal Trade Comm'n v. Cephalon, Inc.*,
Case No. 2:08-cv-2141, Doc. 405 (E.D. Pa. June 17, 2015) ...................................8

*In re Flonase Antitrust Litig.*,
692 F. Supp. 2d 524 (E.D. Pa. 2010) ..........................................................................16

*FTC v. Indiana Fed'n of Dentists*,
476 U.S. 447 (1986) ......................................................................................................25

*In re Generic Pharms. Pricing Antitrust Litig.*,
368 F. Supp. 3d 814 (E.D. 2019) ................................................................................22

*Henry v. Bank of Am.*,
147 A.D.3d 599 (N.Y. App. Div. 2017) .....................................................................12

*Holmes v. Am. States Ins. Co.*,
1 P.3d 552 (Utah 2000) ................................................................................................29

*Hosp. Auth. Of Metro. Gov't of Nashville & Davidson Cty.
v. Momenta Pharms., Inc.*, 353 F. Supp. 3d 678 (M.D. Tenn. 2018) ...................17

*In re Hydroxycut Mktg. & Sales Pracs. Litig.*,
299 F.R.D. 648 (S.D. Cal. 2014) .................................................................................30

*Illinois Brick v. State of Ill.*,
431 U.S. 720 (1977) ........................................................................................................1

*In re Interior Molded Doors Antitrust Litig.*,
2019 WL 4478734 (E.D. Va. Sept. 18, 2019) ...........................................................22

*Julian v. TTE Tech., Inc.*,
2020 WL 6743912 (N.D. Cal. Nov. 17, 2020) ..........................................................23

*Klehr v. A.O. Smith Corp.*,
521 U.S. 179 (1997) ...............................................................................................8, 9, 13

*In re Lamictal Indirect Purchaser & Antitrust Consumer Litig.*,
172 F. Supp. 3d 724 (D.N.J. 2016) .......................................................................12, 13

*Lampkin v. Dist. of Columbia*,
886 F. Supp. 56 (D.D.C. 1995) .....................................................................................5

*Landgraf v. USI Film Products*,
    511 U.S. 244 (1994) ...............................................................................................19

*Langan v. Johnson & Johnson Consumer Cos., Inc.*,
    897 F.3d 88 (2d Cir. 2018) ......................................................................................20

*Langston v. Riffe*,
    754 A.2d 389 (Md. 2000) .......................................................................................19

*In re Lidoderm Antitrust Litig.*,
    103 F. Supp. 3d 1155 (N.D. Cal. 2015) ..................................................................29

*In re Liquid Aluminum Sulfate Antitrust Litig.*,
    2017 WL 3131977 (D.N.J. July 20, 2017) ..............................................................17

*In re Loestrin 24 FE Antitrust Litig.*,
    410 F. Supp. 3d 352 (D.R.I. 2019) ...................................................................19, 26

*Mayor of Baltimore v. Actelion Pharms., Ltd.*,
    995 F.3d 123 (4th Cir. 2021) .......................................................................10, 11, 20

*McCorkle v. McCorkle*,
    811 So. 2d 258 (Miss. Ct. App. 2001) ....................................................................14

*Morrison v. YTB Int'l, Inc.*,
    649 F.3d 533 (7th Cir. 2011) ..................................................................................20

*In re Namenda Direct Purchaser Antitrust Litig.*,
    331 F. Supp. 3d 152 (S.D.N.Y. 2018) .......................................................................7

*In re Namenda Direct Purchaser Antitrust Litig.*,
    462 F. Supp. 3d 307 (S.D.N.Y. 2020) .......................................................................7

*In re Namenda Indirect Purchaser Antitrust Litig.*,
    2021 WL 2403727 (S.D.N.Y. June 11, 2021) ...................................................10, 14

*In re Nat'l Prescription Opiate Litig.*,
    2019 WL 2477416 (N.D. Ohio Apr. 1, 2019) .........................................................29

*In re Nat'l Prescription Opiate Litig.*,
    2019 WL 3737023 (N.D. Ohio June 13, 2019), .......................................................29

*In re New Motor Vehicles Canadian Export Antitrust Litig.*,
    350 F. Supp. 2d 160 (D. Me. 2004) ...................................................................25, 29

*New York v. Actavis PLC*,
    787 F.3d 638 (2d Cir. 2015) ......................................................................................7

*In re Niaspan Antitrust Litig.*,
42 F. Supp. 3d 735 (E.D. Pa. 2014) ...................................................................10

*In re Novartis & Par Antitrust Litig.*,
2019 WL 3841711 (S.D.N.Y. Aug. 15, 2019) .....................................................16

*In re Opana ER Antitrust Litig.*,
162 F. Supp. 3d 704 (N.D. Ill. 2016) .................................................................13

*In re Packaged Seafood Prods. Antitrust Litig.*,
242 F. Supp. 3d 1033 (S.D.C.A. 2017)..........................................................26, 28

*In re Pharm. Indus. Average Wholesale Price Litig.*,
491 F. Supp. 2d 20 (D. Mass. 2007) ............................................................27, 28

*In re Pork Antitrust Litig.*,
495 F. Supp. 3d 753 (D. Minn. 2020) .....................................................16, 22, 30

*In re Processed Egg Prods. Antitrust Litig.*,
851 F. Supp. 2d 867 (E.D. Pa. 2012) .................................................................25

*In re Propranolol Antitrust Litig.*,
249 F. Supp. 3d 712 (S.D.N.Y. 2017)................................................................16

*In re Relafen Antitrust Litig.*,
221 F.R.D. 260 (D. Mass. 2004).......................................................................20

*In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*,
355 F. Supp. 3d 145 (E.D.N.Y. 2018) ...............................................................28

*Richards v. Direct Energy Servs., LLC*,
915 F.3d 88 (2d Cir. 2019)...............................................................................20

*Robinson v. Sanctuary Rec. Grps., Ltd.*,
763 F. Supp. 2d 629 (S.D.N.Y. 2011)................................................................23

*Safka Holdings LLC v. iPlay, Inc.*,
42 F. Supp. 3d 488 (S.D.N.Y. 2013)..................................................................23

*Sandee's Catering v. Agri Stats, Inc.*,
2020 WL 6273477 (N.D. Ill. Oct. 26, 2020).......................................................22

*Selkirk v. State*,
671 N.Y.S.2d 824 (N.Y. App. Div. 1998) ...........................................................12

*Sergeants Benevolent Ass'n Health & Welfare Fund v. Actavis, PLC*,
2016 WL 4992690 (S.D.N.Y. Sept. 13, 2016)......................................................9

*Sergeants Benevolent Ass'n Health & Welfare Fund v. Actavis, PLC*,
    2018 WL 7197233 (S.D.N.Y. Dec. 26, 2018) ...................................................4, 18, 21, 26, 28

*Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*,
    559 U.S. 393 (2010)................................................................................................................15

*Sonner v. Premier Nutrition Corp.*,
    971 F.3d 834 (9th Cir. 2020) .................................................................................................23

*Soto v. Bushmaster Firearms Int'l, LLC*,
    202 A.3d 262 (Conn. 2019) ................................................................................................24, 25

*Staley v. Gilead Scis., Inc.*,
    446 F. Supp. 3d 578 (N.D. Cal. 2020) ...............................................................................27, 28

*In re Suboxone*,
    2017 WL 4642285 (E.D. Pa. Oct. 17, 2017)...........................................................................11

*Travelers Ins. Co. v. 633 Third Assocs.*,
    973 F.2d 82 (2d Cir. 1992).....................................................................................................23

*Winfree v. N. Pac. Ry. Co.*,
    227 U.S. 296 (1913) ................................................................................................................19

*Zanni v. Town of Johnston*,
    224 A.3d 461 (R.I. 2020) ........................................................................................................19

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
    395 U.S. 100 (1969)..................................................................................................................5

*In re Zetia (Ezetimibe) Antitrust Litig.*,
    2019 WL 1397228 (E.D. Va. Feb. 6, 2019)............................................................................15

**Statutes**

740 Ill. Comp. Stat. Ann. 10/7(2) ..............................................................................15, 17

K.S.A. § 50-163(b)..................................................................................................................14

Mass. General Laws c. 93A § 9 ..............................................................................................27

Mo. Rev. Stat. § 407.010 .........................................................................................................28

Mo. Rev. Stat. § 407.025 .........................................................................................................29

Mont. Code Ann. § 30-14-133 .............................................................................................29, 30

Mont. Code Ann. § 34-14-102.................................................................................................29

N.Y. Gen. Bus. Law § 340 ...................................................................................................4

N.Y.C.P.L.R. § 214 ...........................................................................................................14

Utah Code Ann. § 13-11-2 .............................................................................................26, 30

Utah Code Ann. § 13-11-3 .................................................................................................29

Utah Code Ann. § 13-11-4 .................................................................................................26

Utah Code Ann. § 13-11-5 .................................................................................................26

Utah Code Ann. § 13-11-19 ...............................................................................................30

Utah Code Ann. § 76-10-3109 ...........................................................................................17

## Other Authorities

Amanda Starc & Thomas G. Wollmann, *Does Entry Remedy Collusion? Evidence
    from the Generic Prescription Drug Cartel* (April 2022),
    https://bfi.uchicago.edu/wp-content/uploads/2022/04/BFI_WP_2022-49.pdf .........................6

Atanu Saha, Henry Grabowski, Howard Birnbaum, Paul Greenberg & Oded
    Bizan, *Generic Competition in the US Pharmaceutical Industry,*
    https://doi.org/10.1080/13571510500519905 ............................................................6

Ryan Conrad, Ph.D. & Randall Lutter, Ph.D., FDA, Center for Drug Evaluation &
    Research, *Generic Competition and Drug Prices: New Evidence Linking
    Greater Generic Competition and Lower Generic Drug Prices* (December
    2019), https://www.fda.gov/about-fda/center-drug-evaluation-and-research-
    cder/generic-competition-and-drug-prices .................................................................5

## INTRODUCTION

The Court should deny every aspect of Defendants' motion to dismiss the End-Payor Plaintiffs' ("EPPs") Second Consolidated Amended Class Action Complaint ("Complaint" or "SCAC").

EPPs are union health and welfare funds and a municipality who assert claims for injunctive and declaratory relief under Clayton Act, 15 U.S.C. § 26, and claims for damages under state-law antitrust and consumer protection statutes. When brand drug manufacturers and generic manufacturers collude to delay price competition for prescription drugs, third-party payors and individual consumers, such as EPPs and members of the proposed Class, who purchase prescription drugs or who pay or reimburse some or all of the costs of their members' prescription drug purchases, bear the brunt of the anticompetitive scheme. The law has always recognized this fundamental reality—when the Supreme Court limited federal damages recovery to "direct" purchasers, in *Illinois Brick v. State of Ill.*, 431 U.S. 720 (1977), it did so over a strenuous dissent, which explicitly acknowledged that "the brunt of antitrust injuries is borne by indirect purchasers." *Id.* at 749.

Following *Illinois Brick*, state legislatures reacted swiftly, and through the years a majority of them enacted "repealer" legislation[1] for the explicit purpose of assuring that *Illinois Brick's* damage limitations are not applied under their state laws, thereby ensuring that the ultimate consumers could be compensated for their antitrust injuries. And in *California v. ARC America Corp.*, 490 U.S. 93 (1989), the Supreme Court held that *Illinois Brick* did not limit the applicability of state laws redressing anticompetitive behavior and that courts must apply repealer state laws

---

[1] Other states did this by judicial interpretation. Collectively both groups, which together comprise the majority of states, are referred to as "repealer states."

consistently with the intentions of state legislatures. Indeed, as *ARC America* made clear, repealer state laws are separately enforceable and diverge from federal law only because they protect end payors rather than direct purchasers.[2]

Since *ARC America*, defendants have devised creative strategies to read *Illinois Brick's* limitations back into state laws. Defendants here rest their motion on several pages from that playbook, arguing that EPPs lack standing, that their claims are time-barred, or not recognized for a variety of concocted reasons. Those ploys cannot succeed—EPPs' standing is solid, and their claims are timely and well-established. Many other courts have routinely rejected the very arguments Defendants try to resurrect here. Defendants' motion should be denied.

## ARGUMENT

### I.    EPPs' Complaint Is Adequately Pled Under *Actavis*

There is no dispute that the state antitrust laws under which EPPs bring their antitrust claims are consistently interpreted in parallel, if not identically, with the federal antitrust statutes. *See* Appendix E to Defendants' prior motion to dismiss (ECF No. 272); *see also* SCAC ¶¶ 358, 368, 382. EPPs' pay-for-delay allegations are substantially similar to the Sherman Act claims brought by the direct purchasers' ("DPP") and Retailer Plaintiffs' and should be upheld for the same reasons they argue in their joint opposition.[3] Specifically, this Court has already held that Plaintiffs have satisfied their pleading burden of plausibly alleging that Forest made "large" reverse payments to the Generic Defendants. Jan. 24, 2022 Opinion and Order (ECF No. 349) at

---

[2] Although state repealer laws protect "indirect" purchasers, they are not secondary or derivative to federal law, or "direct" purchasers, in the way that some mistakenly suppose based on "direct/indirect" terminology. Plaintiffs believe the more accurate appellation here to be "End-Payor Plaintiffs," because EPPs are at the end of the distribution chain.

[3] EPPs hereby join and incorporate by reference all facts and arguments in the Opposition to Defendants' Motion to Dismiss the Direct Purchaser and Retailer Plaintiffs' Third Amended Complaints.

30, 37, 44, 48, 50, 52. This Court further held that Plaintiffs were required to allege that the large reverse payments were "unjustified," and that Plaintiffs failed to plead sufficient facts to meet that burden. The Court then set forth a roadmap of the types of factual allegations that might allow Plaintiffs to "satisfy [their] pleading burden" of plausibly alleging that the payments were unjustified. *Id.* at 31. The SCAC (like the DPPs' and Retailers' amended complaints) follows this roadmap, adding numerous and specific facts regarding each side deal between Forest and the Generic Defendants that plausibly allege that these deals were not bona fide business arrangements but were pretextual agreements through which Forest paid each Generic Defendant large sums of money to quit their respective Bystolic patent fights in exchange for their agreement to delay entry of lower-cost generic Bystolic. *See generally* SCAC ¶¶ 198-288. Defendants' challenges to these allegations are counter-factual and not a basis for dismissal. *See* Jan. 24, 2022 Opinion and Order at 45 ("[P]laintiffs are correct that [] allegations by the movant are not included in the DPP Complaint and are thus not properly before the Court on a motion to dismiss").

Moreover, EPPs have provided detailed allegations as to each Defendant and sufficiently connected the alleged conduct to the specific elements of every state's antitrust laws—far more than is required to sustain a Complaint at the pleading stage. *See In re Bayer Corp. Combination Aspirin Prods. Mktg. & Sales Pracs. Litig.*, 701 F. Supp. 2d 356, 378-79 (E.D.N.Y. 2010) (holding that a complaint need "outline[] only the broad contours of the state law causes of action" and "draw[] the connection between the statutes and the defendant's offending conduct."). Even a quick reading of EPPs' claims contradicts Defendants' argument that they are "boilerplate." (Defs.' Br. 3). And while each *heading* for the individual state law antitrust claims does cite the main section of the law followed by an "*et seq.*" cite, if Defendants looked beyond the headings, they would see that each paragraph provides far more than a "general list" of citations. Each

individual state paragraph also quotes and cites the specific provisions of each antitrust law under which EPPs are suing and links Defendants' conduct to the law.[4] *Id. See also Sergeants Benevolent Ass'n Health & Welfare Fund v. Actavis, plc*, 2018 WL 7197233, at *35 (S.D.N.Y. Dec. 26, 2018) ("*Namenda II*") (holding that plaintiffs are not required to identify the particular sections of the code under which the claims are brought, as long as defendants are on notice of the theory plaintiffs are pursuing). Indeed, for each of the three groups of antitrust claims (monopolization, conspiracy to monopolize, and combination and conspiracy in restraint of trade), EPPs: incorporate by reference the specific allegations against Defendants made earlier in the Complaint; provide a summary of allegations relevant to the particular antitrust claim in numerous subsequent paragraphs; and then link those detailed allegations to specific language in each of the state antitrust statutes that gives rise to EPPs' claims. *See generally* SCAC ¶¶ 349-384. And as argued more fully below in Section V, the same is true for each of EPPs' consumer protection claims. *See generally* ¶¶ 385-435. Defendants' disingenuous characterizations about the adequacy of EPPs' claims should be disregarded.

## II.     EPPs' Injunctive Relief Claim Is Not Moot

Section 16 of the Clayton Act authorizes injunctive relief to address violations of the antitrust laws. *See Cargill, Inc. v. Monfort of Colorado, Inc*., 479 U.S. 104, 126, (1986). To obtain

---

[4] *See, e.g.*, SCAC ¶ 382(r): "**N.Y. Gen. Bus. Law §§ 340, *et seq*.** Defendants violated New York's Donnelly Act, which provides that "[e]very contract, agreement, arrangement or combination" in the state for monopoly or in restraint of trade is illegal and void. *Id.* Class members paid for and/or reimbursed millions of dollars' worth of Bystolic in the state of New York. By virtue of Defendants' unlawful reverse payment agreements as alleged in ¶¶ 198-288 above, Defendants entered a contract, agreement, arrangement, or combination in unreasonable restraint of trade in violation of New York's Donnelly Act. Defendants' conduct had a substantial effect on trade and commerce in New York, as Class members (including those located within New York) with purchases and/or reimbursements of Bystolic in the state of New York were overcharged on their purchases and/or reimbursements. In the absence of Defendants' unlawful conduct, Class members with purchases and/or reimbursements of Bystolic in the state of New York would have paid competitive, non-monopoly prices with the earlier availability of generic Bystolic on the market."

injunctive relief under Section 16, plaintiffs "'need only demonstrate a significant threat of injury from an impending violation of the antitrust laws or from a contemporary violation likely to continue or recur.'" *Id*. (quoting *Zenith Radio Corp. v. Hazeltine Research, Inc*., 395 U.S. 100, 130 (1969)). Plaintiffs satisfy this standard.

As it has been interpreted, Section 16 authorizes two different kinds of injunctions: (i) "preventive" injunctions, which "attempt[ ] to foreclose a future harmful act,"; and (ii) "reparative" injunctions, which are aimed at "prevent[ing] the future harmful effects of past acts . . ." *Lampkin v. Dist. of Columbia*, 886 F. Supp. 56, 62 (D.D.C. 1995) (citing Dan B. Dobbs, Law of Remedies 164 (2d ed. 1993)); *see also California v. Am. Stores Co.*, 495 U.S. 271, 282, 110 S. Ct. 1853, 109 L.Ed.2d 240 (1990) (interpreting Section 16 to authorize divestiture, a reparative remedy, so long as the "harm to ... consumers persists" from, and therefore is still "threatened" by, the unlawful merger); *Zenith*, 395 U.S. at 130 (interpreting Section 16 to authorize preventive injunctive relief to remedy violation that is likely to "recur."). Plaintiffs have plausibly alleged that they are entitled to both a preventive and reparative injunction.

### A. EPPs Sufficiently Allege the Need for a Reparative Injunction

Here, a reparative injunction is necessary to prevent ongoing and future harmful effects of Defendants' unlawful pay-for-delay agreements. Although generic formulations of Bystolic have belatedly entered the market, prices for prescription drugs do not immediately reach competitive levels as soon as generic entry occurs. Indeed, research, including empirical research from the Food and Drug Administration, demonstrates that prices continue to decline with each successive generic entrant and monopolistic pricing often continues long after entry occurs.[5] As a result,

---

[5] *See* Ryan Conrad, Ph.D. & Randall Lutter, Ph.D., FDA, Center for Drug Evaluation & Research, *Generic Competition and Drug Prices: New Evidence Linking Greater Generic Competition and*

Defendants' claim that there is "nothing to enjoin," (Defs.' Br. 5) is wrong and the cases they cite for that proposition are inapposite.

EPPs intend to present expert analysis regarding the extent to which Defendants' unlawful (and successful) efforts to impede and delay generic entry continue to produce harmful effects in the form of persistent elevation of prices for Bystolic above competitive levels. Fact and expert discovery are necessary to determine when prices will reach competitive levels. As a result, allowing Plaintiffs' claim for a reparative injunction to proceed is both necessary and appropriate. Indeed, in similar cases, courts have recognized that the dismissal of such claims would be prejudicial while their continued inclusion is not. *See In re Aggrenox Antitrust Litig.*, 2016 WL 4204478, at *2 (D. Conn. Aug. 9, 2016) (denying motion to dismiss injunctive relief claim and recognizing that it would be "significant to have wrongly dismissed them. But if they are indeed moot . . . then they will fall by the wayside and will not be pursued at trial, and their ongoing inclusion at this stage will not prejudice any party in any way."). Moreover, given that Plaintiffs are entitled to all reasonable inferences in their favor at this stage of the case, EPPs' claim for injunctive relief should not be dismissed.

### B.  EPPs Sufficiently Allege the Need for a Preventive Injunction

EPPs are likewise entitled to a preventive injunction. This is not the first time Defendants

---

*Lower Generic Drug Prices* (December 2019), https://www.fda.gov/about-fda/center-drug-evaluation-and-research-cder/generic-competition-and-drug-prices. *See also* Amanda Starc & Thomas G. Wollmann, *Does Entry Remedy Collusion? Evidence from the Generic Prescription Drug Cartel*, at 39 (April 2022) ("even in markets where entrants do eventually undercut the collusive agreement, monopoly-like prices persist for long periods"), https://bfi.uchicago.edu/wp-content/uploads/2022/04/BFI_WP_2022-49.pdf; Atanu Saha, Henry Grabowski, Howard Birnbaum, Paul Greenberg & Oded Bizan, *Generic Competition in the US Pharmaceutical Industry*, International Journal of the Economics of Business 13:1 (2006), at Figure 2b, https://doi.org/10.1080/13571510500519905 (showing average prices for generic drugs decreasing for at least three years following generic entry).

have engaged in an unlawful pay-for-delay scheme, nor is it likely to be the last. Defendant Forest, for example, has repeatedly attempted to extend its monopolies by conspiring with potential generic competitors to delay generic entry. Indeed, with respect to its drug Namenda, in addition to an unlawful product hop, Forest allegedly used reverse payments to delay generic competition. Significantly, the reverse payments there share a common *modus operandi* to those here—the use of side deals to confer value as an inducement to delay generic competition. *See In re Namenda Direct Purchaser Antitrust Litig.*, 331 F. Supp. 3d 152 (S.D.N.Y. 2018) (denying summary judgment on reverse-payment claims); *In re Namenda Direct Purchaser Antitrust Litig.*, 462 F. Supp. 3d 307 (S.D.N.Y. 2020) (approving $750 million settlement resolving reverse-payment allegations); *New York v. Actavis PLC*, 787 F.3d 638 (2d Cir. 2015) (affirming district court's order preliminarily enjoining Forest from restricting access to Namenda IR in order to favor sales of Namenda XR).

As a result, if EPPs prevail on the merits, injunctive relief may be necessary to restrain AbbVie (Forest's successor) from engaging in similar anticompetitive conduct in the future.[6] Similarly, each of the Generic Defendants demanded and accepted unlawful payments in order to delay generic entry, and some of those Defendants are likewise repeat offenders. For example, Defendant Actavis (purchased, along with Defendant Watson, by Defendant Teva; *see* SCAC, ¶ 95), is the namesake of the Supreme Court's decision holding that pay-for-delay agreements such as those alleged here may be unlawful. *F.T.C. v. Actavis, Inc.*, 570 U.S. 136 (2013). As a result, preventive injunctive relief may be necessary to restrain the Generic Defendants from engaging in

---

[6] Plaintiffs include health and welfare benefit plans that pay for a wide variety of prescription drugs used by their members and beneficiaries, and the proposed Class includes such entities as well as consumers. Thus, any similar anticompetitive conduct by Defendants with respect to other drugs in the future is virtually certain to affect some or all of the Plaintiffs and members of the proposed Class.

similar anticompetitive conduct in the future. Indeed, permanent injunctions have been entered in similar cases *years after* generic entry. *See Federal Trade Comm'n v. Cephalon, Inc.*, Case No. 2:08-cv-2141, Doc. 405 (E.D. Pa. June 17, 2015) (entering Stipulated Order for Permanent Injunction and Equitable Monetary Relief prohibiting the defendants from entering into similar agreements in the future even though the challenged reverse-payment agreements specified an entry date of April 2012 and generic entry had already occurred). Accordingly, given Plaintiffs' well-pled allegations and the lack of prejudice associated with allowing the claim to proceed, EPPs' claim for injunctive relief should not be dismissed.

## III.   EPPs Claims Are Timely

Statute of limitations is an affirmative defense and as a result, a complaint cannot be dismissed under Rule 12(b)(6) unless plaintiffs' claims are time-barred "on the face of the complaint." *Ellul v. Congregation of Christian Bros.*, 774 F.3d 791, 798 n.12 (2d Cir. 2014). Defendants cannot make that showing here.

### A.   EPPs' Claims Are Timely Under the Normal Accrual Rule and Binding Precedent

Defendants incorrectly contend that EPPs' claims are untimely because the Complaint was filed more than six years "after the last of the agreements was executed." Defs.' Br. 7. Unsurprisingly, Defendants cite no authority to support this proposition because it is wrong. Rather, as the Supreme Court explained in *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 190-91 (1997), the "normal accrual rule" in an antitrust case requires "starting the limitations period at the point the act first causes injury." Here, EPPs were injured by paying overcharges for Bystolic. *See e.g.*, SCAC ¶¶ 28, 47. That injury first occurred, not when the agreements were executed, but when a generic could have come to market but did not as a result of Defendants' anticompetitive conduct. While the precise date generic entry could have occurred is a question of fact that is not appropriate for resolution at this stage, EPPs plausibly allege that this date would have been earlier than

September 17, 2021—the agreed-upon entry dates contained in the settlement agreements. *See* SCAC ¶¶ 11-12, 24.

The Second Circuit's decision in *Berkey Photo, Inc. v. Eastman Kodak Co*., 603 F.2d 263 (2d Cir. 1979), confirms this rule and demonstrates the timeliness of EPPs' claims. In that case, the Court of Appeals held that "a purchaser suing a monopolist for overcharges paid within the previous four years may satisfy the conduct prerequisite to recovery by pointing to anticompetitive actions taken before the limitations period." That is precisely the situation here: EPPs point to Defendants' unlawful, anticompetitive agreements as the conduct giving rise to the overcharges EPPs paid during the limitations period. It is black letter antitrust law under *Klehr* and *Berkey Photo* that such claims are timely.

Indeed, Forest has made this identical argument before, which has been rejected as incompatible with *Klehr* and *Berkey Photo*. In *Sergeants Benevolent Ass'n Health & Welfare Fund v. Actavis, PLC*, 2016 WL 4992690 (S.D.N.Y. Sept. 13, 2016), the court reasoned:

> Defendants argue that the Direct Purchaser Plaintiff's settlement agreement claims are time-barred because its complaint was filed more than five years after the last settlement agreement was executed. That is not correct. The alleged wrong suffered by Plaintiffs is the payment of artificially high prices for memantine treatment – something that occurs every time Plaintiffs have to pay for a patient's brand-name . . . medication when, absent Forest's or Forest and the Generic Defendants' allegedly anticompetitive conduct, they would have instead paid far less for a generic. . . . The wrong complained of is not the execution of the settlement agreements – acts that did not themselves cause any injury to Plaintiffs until the resulting overcharge hit them in their pocketbooks.

2016 WL 4992690, at *16. The court should reach the same result here.

### B.  EPPs' Claims Are Also Timely Under the Continuing Violation Doctrine

Plaintiffs' claims are also timely under the continuing violation doctrine. The Supreme Court explained this well-established rule as follows:

> Antitrust law provides that, in the case of a continuing violation, . . . each overt act that is part of the violation and that injures the plaintiff, e.g., each sale to the

9

> plaintiff, starts the statutory period running again, regardless of the plaintiff's knowledge of the alleged illegality at much earlier times.

*Klehr*, 521 U.S. at 189 (emphasis added). Here, EPPs plausibly allege a continuing violation—Defendants continued to abide by the terms of the alleged anticompetitive agreements, which in turn has allowed them to continue to sell Bystolic and generic Bystolic to Plaintiffs and members of the proposed Class at supracompetitive prices. *See* SCAC ¶¶ 344-348. Under *Klehr*, each purchase by EPPs at artificially inflated prices restarts the limitations period. Accordingly, even after EPPs were *first* injured—i.e., when a generic could have come to market but did not as a result of Defendants' anticompetitive agreements—they continued to be injured anew each time they purchased Bystolic at supracompetitive prices *after* that date. Here, EPPs paid supracompetitive prices until September 2021—the agreed-upon delayed entry date—and have continued to pay supracompetitive prices even after generic entry occurred in September 2021. *See* § II, *supra*. And EPPs' complaint was filed *before* generic entry occurred. As a result, EPPs' claims are timely even under the shortest of the applicable state statutes of limitations.

Indeed, "[e]very court to have considered this issue in the pay-for-delay context has held that a new cause of action accrues to purchasers upon each overpriced sale of the drug." *See In re Niaspan Antitrust Litig*., 42 F. Supp. 3d 735, 746–47 (E.D. Pa. 2014) (collecting cases); *see also In re Namenda Indirect Purchaser Antitrust Litig*., 2021 WL 2403727, at *41 (S.D.N.Y. June 11, 2021) (collecting cases) ("this Court agrees with others that have concluded that claims in indirect-purchaser actions are timely because there are allegations of overcharges within the class period that are within the statute of limitations."); *In re Aggrenox Antitrust Litig.*, 94 F. Supp. 3d 224, 238 (D. Conn. 2015) (holding that "a purchaser suing a monopolist for overcharges is injured anew by each overcharge").

A recent decision by the United States Court of Appeals for the Fourth Circuit is also

instructive. In *Mayor of Baltimore v. Actelion Pharmaceuticals, Ltd.*, 995 F.3d 123 (4th Cir. 2021), indirect purchaser plaintiffs alleged that Defendants' refusal to provide samples of the brand product, which were necessary to conduct bioequivalence testing, delayed the entry of generic Tracleer. *Id.* at 125. The district court dismissed most of plaintiffs' claims as untimely, because plaintiffs' complaint was filed on November 19, 2018, more than four years after the denial of samples. *Id.* The Court of Appeals reversed, holding that "because the plaintiffs alleged that Actelion continued with anticompetitive acts after November 2015 in selling Tracleer at supracompetitive prices, new limitations periods began to run from each sale that caused the plaintiffs damages." *Id.* at 126. The Fourth Circuit held that plaintiffs' claims were timely on several bases: (1) "the standard antitrust accrual rule" that plaintiffs' cause of action accrued only when they paid overcharges; (2) "the correlative speculative-damages doctrine," which holds that until plaintiffs make purchases at inflated prices,[7] their damages are too speculative to recover; and (3) "the continuing-violation doctrine," under which "a new limitations period began to run from each such sale" at a supracompetitive price. *Id.* at 131. The same reasoning applies here.

Defendants' contention that the court must conduct a state-by-state analysis to determine whether the continuing violation doctrine applies is belied by their own concessions and the cases they rely upon. Indeed, in prior briefing, Defendants acknowledged that state antitrust laws are to be read in harmony with federal antitrust laws and corresponding "federal antitrust doctrines." *See* Defs.' Br. Appendix E (ECF No. 272). Other courts have likewise confirmed that state antitrust law is "consistently interpreted in parallel, if not identically, with the Sherman Act . . ." *In re Suboxone*, 2017 WL 4642285, at *12 (E.D. Pa. Oct. 17, 2017) (collecting cases). Thus, the

---

[7] As explained, in the context of pharmaceutical antitrust cases, damages do not accrue until a plaintiff's injury first occurs, i.e., when a generic could have entered the market but did not as a result of Defendants' anticompetitive conduct.

continuing violation doctrine applies equally to federal and state law antitrust claims.

Moreover, here, Defendants cite to no state antitrust statute disavowing the continuing violation doctrine, relying instead *exclusively* on non-antitrust cases to ask this court to reject the continuing violation doctrine. The non-antitrust cases they do cite to distinguish between unlawful acts and continuing effects are inapposite because, as argued above, each sale of brand-name Bystolic at supracompetitive prices *is* an anticompetitive act that restarts the statute of limitations. *See* Defs.' Br. 9-10 citing *Henry v. Bank of Am.*, 147 A.D.3d 599, 601 (N.Y. App. Div. 2017); *Bullard v. State*, 307 A.D.2d 676, 678 (N.Y. App. Div. 2003); *Commack Self-Serv. Kosher Meats Inc. v. State*, 270 A.D.2d 687, 688 (N.Y. App. Div. 2000); and *Selkirk v. State*, 671 N.Y.S.2d 824, 825 (N.Y. App. Div. 1998). The Court should decline Defendants' invitation to upend the purpose and intent of state antitrust laws without providing any express authority that supports such a drastic result.[8]

Defendants' contrary arguments rely heavily on *In re Lamictal Indirect Purchaser & Antitrust Consumer Litigation*, 172 F. Supp. 3d 724 (D.N.J. 2016), which they contend addresses "virtually the same question presented here." Defs.' Br. 9. Defendants' characterization of *Lamictal* is inaccurate, and their reliance on it is misplaced. In *Lamictal*, limited generic entry occurred on June 1, 2005, and unimpeded generic entry occurred upon expiration of the relevant patent on July 21, 2008. *Id.* at 733. Indirect purchasers filed their complaint *more than four years later*, on August 14, 2012. *Id.* at 734. Thus, in *Lamictal*, unlike in this case, plaintiffs did not allege

---

[8] Contrary to Defendants' contention, Plaintiffs have clearly demonstrated that their claims are timely and that the continuing violation doctrine applies. *See* Defs.' Br. 8-9. To the extent Defendants are suggesting that Plaintiffs were required to *plead* additional elements in their complaint regarding the application of the law and these antitrust doctrines, they are wrong. Complaints plead facts, not the law. *See Alden Mgmt. Servs., Inc. v. Chao*, 532 F.3d 578, 582 (7th Cir. 2008).

that they made any purchases of brand-name Lamictal during the four-year period prior to filing their complaint at prices that were inflated due to delayed generic entry.[9] Instead, they sought to apply the continuing violation doctrine to *toll* the statute of limitations and revive claims for purchases made outside the four-year statute of limitations period. Because they failed to allege that they had made purchases of Lamictal at artificially inflated prices within four years of filing their complaint, their claims were dismissed (without prejudice) as untimely. *Id*. at 756.

The district court's holding in *Lamictal* is entirely consistent with *Klehr*, *Berkey Photo*, and EPPs' position in this case. Unlike in *Lamictal*, EPPs here do not seek to bring claims based on purchases made outside the relevant statutes of limitations based on equitable tolling or fraudulent concealment. Rather, EPPs seek only to bring claims for overcharges on purchases made *within* the relevant statutes of limitations. As the Supreme Court noted in *Klehr*, each overcharge to the plaintiff is an "overt act" that "starts the statutory period running again," "[b]ut the commission of a separate new overt act generally does not permit the plaintiff to recover for the injury caused by old overt acts outside the limitations period." *Klehr*, 521 U.S. at 189.

Defendants' reliance on *In re Opana ER Antitrust Litigation*, 162 F. Supp. 3d 704 (N.D. Ill. 2016), is similarly misplaced. In that case, indirect purchasers brought antitrust claims under the laws of 28 jurisdictions (along with consumer protection claims under the laws of 4 jurisdictions and unjust enrichment claims under the laws of 32 jurisdictions). *Id*. at 721. The district court dismissed antitrust claims under the laws of *just two states*—Kansas and Mississippi—because it did not believe those states permitted the use of the continuing violations doctrine to "toll" the applicable statutes of limitations. *Id*. at 725. First, and importantly, EPPs here

---

[9] As noted above, EPPs here filed their complaints *before* generic entry, while prices for brand-name Bystolic were artificially inflated due to Defendants' unlawful pay-for-delay agreements.

do not seek to "toll" the applicable statutes of limitations, as all of the overcharges for which they seek to recover occurred *within* the applicable statutes of limitations. Second, the *Opana* court was mistaken about Mississippi and Kansas law because the decision fails to recognize, as demonstrated above, that federal and state antitrust laws are to be interpreted identically. For example, as is the case with other state antitrust laws, the Kansas antitrust statute makes clear that it should be "construed in harmony with ruling judicial interpretations of federal antitrust law by the United States supreme court." K.S.A. § 50-163(b). Setting aside this fundamental flaw, in Mississippi, the continuing violation doctrine does indeed toll the statute of limitations. *See McCorkle v. McCorkle*, 811 So. 2d 258, 264 (Miss. Ct. App. 2001) ("A continuing tort involves a repeated injury and the cause of action begins to run from the date of the last injury, tolling the statute of limitations."). As explained above, EPPs claims are timely under the United States Supreme Court's decision in *Klehr*.

### C.  New York's Borrowing Statute Is Irrelevant

Defendants also argue that under New York's borrowing statute, Plaintiffs' claims must be timely under the shorter of New York's statute of limitations and that of the state where the cause of action accrued. Defendants fail to cite any cases applying this doctrine in the context of an indirect purchaser antitrust action, and EPPs are aware of none. Indeed, federal courts in indirect purchaser antitrust actions typically apply the statutes of limitations of the states in which Plaintiffs' causes of action accrued, without regard to the forum state's statute of limitations. *See, e.g.*, *In re Namenda Indirect Purchaser Antitrust Litig.*, 2021 WL 2403727, at *40-1.

Even if Defendants were correct, however, there would be no impact on the timeliness of EPPs' claims. New York's statute of limitations is four years for antitrust claims, N.Y. Gen. Bus. Law § 340(5), and three years for consumer protection claims. N.Y.C.P.L.R. § 214(2). The only

statute of limitations that would have to be considered for timeliness purposes by the application of the N.Y. borrowing statute are EPPs' Maine and Wisconsin antitrust claims (from 6 years to 4), EPPs' California, Florida, and Massachusetts consumer protection claims (from 4 years to 3), and EPPs' Missouri consumer protection claims (from 5 years to 3). *See* Appx. B to Defs.' Br., ECF No. 398-2. As demonstrated above, these claims—and indeed all of EPPs' claims—would nonetheless be timely under both the normal accrual rule and the continuing violation doctrine, as EPPs have paid inflated prices in both the three- and four-year timespan prior to the filing of their complaint.

## IV.     EPPs' State Antitrust Claims Are All Viable

### A.     EPPs Allege Viable Antitrust Claims Under Illinois, Utah, Connecticut, Maryland, and Rhode Island Statutes

The Class includes end payors that made purchases at supracompetitive prices in each U.S. state and territory where EPPs have pursued claims. This satisfies the statutory standing requirements in all relevant jurisdictions. Defendants' arguments that certain states do not provide for or limit EPP antitrust class actions are incorrect. Defs.' Br. 11-14.

**Illinois.** The Illinois Antitrust Act (IAA) expressly rejects *Illinois Brick*: "[n]o provision of this Act shall deny any person who is an indirect purchaser the right to sue for damages." 740 Ill. Comp. Stat. Ann. 10/7(2). Defendants mistakenly rely on language in the IAA that permits class actions only by the Attorney General "*in any court of this State*." 740 Ill. Comp. Stat. Ann. 10/7(2) (emphasis added). But this Court, a federal district court, is *not* a court "of" Illinois. *See, e.g.*, *In re Zetia (Ezetimibe) Antitrust Litig.*, 2019 WL 1397228, at *26 (E.D. Va. Feb. 6, 2019) ("By its plain language, [the Illinois statute] does not include this court.").

Moreover, the U.S. Supreme Court, in *Shady Grove Orthopedic Associates, P.A. v. Allstate Insurance Co.*, 559 U.S. 393, 408 (2010), requires federal courts sitting in diversity to apply federal

procedural rules, including Rule 23. Recent federal courts confronting this question have recognized that Rule 23 permits Illinois antitrust class actions on behalf of indirect purchasers to proceed in federal court. *See, e.g.*, *In re Propranolol Antitrust Litig.*, 249 F. Supp. 3d 712, 728 (S.D.N.Y. 2017) ("it is 'not obvious that the formulaic expression 'in any court of this State' appearing in an Illinois statute applies to a federal court . . . '" and finding that the Illinois "state procedural rule does not control in federal court, where Rule 23 sets the only relevant requirements to file a class action.") (quoting *In re Aggrenox Antitrust Litig.*, 2016 WL 4204478, at *5). *See also In re Dealer Mgmt. Sys. Antitrust Litig.*, 362 F. Supp. 3d 510, 553 (N.D. Ill. 2019) (rejecting argument that IAA barred class action, noting "Plaintiffs brought their claims in federal court— not state court"); *In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 817-18 (N.D. Ill. 2017) (discussing *Shady Grove*, collecting cases, and permitting Illinois indirect purchaser antitrust class claims to proceed); *In re Pork Antitrust Litig.*, 495 F. Supp. 3d 753, 778 (D. Minn. 2020) (holding "that the IAA rule is purely procedural," and denying motion to dismiss claims based on the IAA's class action bar).

The Defendants' cases either neglect to consider *Shady Grove* or implausibly extend its holding. *In re Flonase Antitrust Litig.*, 692 F. Supp. 2d 524, 530 (E.D. Pa. 2010), predates *Shady Grove* and therefore cannot provide guidance here. *In re Digital Music Antitrust Litig.*, 812 F. Supp. 2d 390, 416 (S.D.N.Y. 2011), misinterprets *Shady Grove* by treating Justice Stevens's concurrence as controlling precedent. Because Justice Stevens' concurrence did not articulate the narrowest holding joined by a majority of the Court, it is error to interpret it as controlling. *See Aggrenox*, 2016 WL 4204478, at *5-6 (the Stevens concurrence "is not a logical subset of the opinion of the other Justices in the majority" because the other Justices "explicitly reject [its] rationale"). The emphasis in these cases on the location of the procedural rule within the statutory framework mistakenly elevates form over substance. *Id.* at *5-6. And *In re Novartis & Par*

16

*Antitrust Litig.*, 2019 WL 3841711, at *7 (S.D.N.Y. Aug. 15, 2019) ("*Exforge*"), merely cites cases like *Digital Music* without any reasoning.

Even under the reading of *Shady Grove* adopted by those cases, the class action bar is procedural rather than substantive, because the IAA expressly gives indirect purchasers the right to seek damages, 740 Ill. Comp. Stat. Ann. 10/7(2). A class action does not alter that right; it is merely a procedural mechanism that affects how those claims proceed in federal court. *See City of Rockford v. Mallinckrodt ARD, Inc.*, 360 F. Supp. 3d 730, 764 (N.D. Ill. 2019), *reconsideration denied*, 2019 WL 2763181 (N.D. Ill. May 3, 2019) (Illinois federal court holding the "Illinois Antitrust Act did not alter the scope of any substantive right or remedy—and is thus not substantive for purposes of *Shady Grove.*").

**Utah.** The EPP Class includes citizens or residents of Utah and thus the EPPs have standing under the Utah Antitrust Act, which expressly permits indirect purchaser suits. Defs.' Br. 13. Although Utah's antitrust statute does limit damages suits by indirect purchasers that are "a citizen . . . or a resident of this state," Utah Code Ann. § 76-10-3109(1)(a), nothing in the statute requires that *named* plaintiffs be Utah citizens. As courts have recognized, "allegations that members of the putative class presumably include Utah citizens and residents are sufficient to overcome a motion to dismiss indirect purchases claims under the Utah Antitrust Act when said allegations assert that said 'members of the putative classes made purchases in Utah.'" *In re Liquid Aluminum Sulfate Antitrust Litig.*, 2017 WL 3131977, at *28 (D.N.J. July 20, 2017) (internal quotation omitted). *See also Hosp. Auth. of Metro. Gov't of Nashville & Davidson Cty. v. Momenta Pharms., Inc.*, 353 F. Supp. 3d 678, 696 (M.D. Tenn. 2018) ("Allegations that members of the putative class presumably include Utah citizens and residents are sufficient to overcome a motion to dismiss."). Here, Plaintiffs have alleged purchases in Utah by members of the putative class. *See* SCAC ¶¶ 358(v);

368(x); 382(y).

The cases on which Defendants rely do not compel a different result. In *Aggrenox*, the Utah claims were improperly dismissed on Article III standing grounds—a result which is clearly improper in light of the Second Circuit's subsequent decision in *Langan*. 94 F. Supp. 3d at 251-52. The other cases on which Defendants rely contain virtually no analysis of the issue. *See In re Effexor Antitrust Litig.*, 357 F. Supp. 3d 363, 393 (D.N.J. 2018); *Namenda II*, 2018 WL 7197233, at *24.

**Connecticut, Maryland, Rhode Island.** Defendants argue that the Court should dismiss EPPs' Connecticut, Maryland, and Rhode Island antitrust claims because they arise from agreements that predate those states' *Illinois Brick* repealer statutes. Defs.' Br. 13-14. This fundamentally misconstrues EPPs' claims. Although Defendants' agreements provide evidence of their anticompetitive conduct, the conduct—and the impact and damages from those agreements—occurred and continued on well-beyond their execution dates. Indeed, because of Defendants' ongoing anticompetitive conduct after the agreements were executed, "generic competition for Bystolic did not begin until September 17, 2021." SCAC ¶ 6. *See also* § III.B, *supra*; SCAC ¶¶ 344-348. "Whether a statute operates retro-actively turns on 'whether the new provision attaches new legal consequences to events *completed* before its enactment.'" *Centurion v. Holder*, 755 F.3d 115, 121 (2d Cir. 2014) (emphasis added) (quoting *Landgraf v. USI Film Products*, 511 U.S. 244, 269-70 (1994)). The anticompetitive activity here was not *completed* before the enactment of the repealer provisions, so there is no need to reach the question of whether they should be applied retroactively. The Complaint alleged anticompetitive conduct that occurred well past the dates each of these states enacted *Illinois Brick* repealer statutes (Rhode Island: July 15, 2013; Connecticut: July 10, 2017; Maryland: October 1, 2017) (*see* Defs.' Br. 13). Even if the court agrees

with Defendants that the repealer statutes do not apply to Defendants' conduct, EPPs are still entitled to post-enactment damages. *In re Loestrin 24 FE Antitrust Litig.*, 410 F. Supp. 3d 352, 374 (D.R.I. 2019) (holding that even where a repealer statute only applied prospectively to defendant's conduct, EPPs were still entitled to "damages incurred after the enactment of the repealer statute").

Further, remedial statutes may be retroactively applied. *See Winfree v. N. Pac. Ry. Co.*, 227 U.S. 296, 301 (1913); *Landgraf*, 511 U.S. at 273 (noting that "application of new statutes passed after the events in suit is unquestionably proper in many situations"). Connecticut, Maryland, and Rhode Island's statutes already prohibited Defendants' anticompetitive conduct; by enacting repealer statutes they simply expanded remedies available to antitrust victims under these states' laws. *See Zanni v. Town of Johnston*, 224 A.3d 461, 467 (R.I. 2020) (statute may be applied retroactively if it is remedial); *D'Eramo v. Smith*, 872 A.2d 408, 416 (Conn. 2005) ("In civil cases, . . . it is presumed that procedural statutes will be applied retrospectively . . . ."); *Langston v. Riffe*, 754 A.2d 389, 396 (Md. 2000) (remedial statutes apply retroactively; "'[a]n act is remedial in nature when it provides only for a new method of enforcement of a preexisting right.'").

Defendants' cases are all inapposite because they focus on retroactive application of statutes. But, as explained above, EPPs do not need these statutes to apply retroactively to reach Defendants' unlawful conduct (D. Br. 14). In sum, each of Connecticut's, Maryland's, and Rhode Island's repealer statutes were enacted before much of Defendants' anticompetitive conduct occurred, and the injury that resulted from that conduct went far beyond the execution dates of the unlawful agreements. Therefore, each statute reaches Defendants' anticompetitive conduct.

### B.  EPPs Have Established Standing in All States

Defendants again argue half-heartedly that EPPs lack standing in states where the named EPPs themselves have not specifically alleged purchases or reimbursements, relegating controlling

Second Circuit authority to a footnote. Defs.' Br. 15 n.6. As Defendants admit, *Langan v. Johnson & Johnson Consumer Cos., Inc.*, 897 F.3d 88, 96 (2d Cir. 2018), already resolved this issue in EPPs' favor, holding that "whether a plaintiff can bring a class action under the state laws of multiple states is a question of predominance under Rule 23(b)(3), not a question of standing under Article III.". Every Circuit court to have squarely addressed the issue, and numerous other courts, have reached the same conclusion. *See, e.g.*, *Mayor of Baltimore v. Actelion Pharms. Ltd.*, 995 F.3d 123, 134 (4th Cir. 2021) (holding that the claims made by plaintiffs on behalf of class members in other states "need not be stricken or disregarded" but instead "considered in determining" commonality, typicality and predominance under Fed. R. Civ. P. 23); *In re Asacol Antitrust Litig.*, 907 F.3d 42, 51 (1st Cir. 2018) ("Our conclusion is in line with our prior precedent . . . requir[ing] only that a plaintiff make a single purchase in order to satisfy standing for a claim brought under multiple state laws."); *Morrison v. YTB Int'l, Inc.*, 649 F.3d 533, 535-36 (7th Cir. 2011). This Court should do the same.

Defendants' arguments for ignoring this binding precedent are unpersuasive. The majority of cases on which Defendants rely are district court cases decided before *Langan*. *See* Defs.' Br. 15 n.5. In *Richards v. Direct Energy Servs., LLC*, 915 F.3d 88 (2d Cir. 2019), which Defendants also cite, the Court expressly stated that it was not addressing the issue for which Defendants cite the opinion. *See id.* at 106. Defendants' approach is also more burdensome. As one court put it, requiring class counsel to "identify representatives from each state involved in a multistate class action, would render class actions considerably more cumbersome to initiate, and in turn, less effective in overcoming a lack of incentives to prosecute individual rights and in 'achiev[ing] economies of time, effort, and expense.'" *In re Relafen Antitrust Litig.*, 221 F.R.D. 260, 269 (D. Mass. 2004) (citation omitted).

**V.      EPPs' State Consumer-Protection Claims Are All Viable**

Contrary to Defendants' arguments, EPPs have sufficiently pleaded violations of certain state's consumer protection laws as a result of their unlawful agreements to delay generic versions of Bystolic. Defs.' Br. 15. At the pleading stage, a complaint need "outline[] only the broad contours of the state law causes of action" and "draw[] the connection between the statutes and the defendant's offending conduct." *Bayer*, 701 F. Supp. 2d 356, 378-79 (E.D.N.Y. 2010). The Complaint does more than that. It pleads detailed factual allegations that Defendants engaged in an unfair, deceptive, and unconscionable scheme to delay competition from generic Bystolic, thereby causing harm to end payors in the relevant states. The Complaint's thorough factual allegations describing Defendants' conduct in entering into and effectuating their unlawful agreements are well-pleaded throughout the Complaint and incorporated by reference into the state consumer protection claims. These detailed allegations do not need to be repeated for each claim, as Defendants appear to demand. *See Namenda II*, 2018 WL 7197233, at *35 ("the factual allegations that support the IPP's claims are well-pleaded throughout the Complaint, and it is not necessary that the IPP reiterate each of them when listing its causes of action in the final section of the Complaint"). The Complaint also details the legal elements of each state statute and ties those elements to the allegations regarding Defendants' conduct. Nothing more is required at this stage. *Bayer*, 701 F. Supp. 2d 356, 378-79.

Moreover, EPPs have satisfied any purported deception requirements by alleging that Defendants concealed their anticompetitive scheme by withholding the details and nature of the payments Forest made in exchange for delayed Bystolic competition. *See* SCAC ¶¶ 205, 389. That is sufficient at the pleading stage. Defendants also wrongly contend that EPPs are required to meet Rule 9(b)'s pleading standards for their consumer protection claims (Defs.' Br. 17). EPPs' claims "must be viewed in the context of the larger antitrust claim, which pertains to unfair business

practices and not fraud." *Sandee's Catering v. Agri Stats, Inc.*, 2020 WL 6273477, at *10 (N.D. Ill. Oct. 26, 2020). Because EPPs' "claims rest on Defendants' alleged unconscionable or deceptive conduct, not on fraud . . . their claims do not require application of the heightened pleading standard of Rule 9(b)." *In re Generic Pharms. Pricing Antitrust Litig.*, 368 F. Supp. 3d 814, at 846 (E.D. 2019). EPPs' Complaint does "not intertwine any explicit claims of fraud—their allegations of anticompetitive practices stand on their own." *Pork*, 495 F. Supp. 3d at 780. As such, EPPs' "consumer-protection claims are not subject to Rule 9(b)." *Id. See also Sandee's Catering*, 2020 WL 6273477, at *10 ("Plaintiff has made infrequent references to fraud and does not allege any fraudulent course of action by Defendants; in the context of the Complaint it is clear that the consumer protection claims arise out of unfair business conduct, namely the antitrust conspiracy. Therefore, Plaintiff must only meet the pleading standards of Rule 8(a)."); *In re Interior Molded Doors Antitrust Litig.*, 2019 WL 4478734, at *17 (E.D. Va. Sept. 18, 2019) ("Here, the plaintiffs have sued the defendants based on an alleged nationwide price-fixing conspiracy. Although the plaintiffs include 'fraud' or 'deception' among a disjunctive list of other potential consumer protection violations, they do not base each claim on fraudulent conduct.").

### A. EPPs Have Stated a Plausible Claim under California's UCL

By alleging purchases of the product affected by Defendants' unfair and unconscionable conduct, EPPs have sufficiently stated a claim under California's Unfair Competition Law. Any violation of law—including a violation of competition law—can form the basis of a UCL claim. Defendants' argument that EPPs' UCL claim should be dismissed to the extent it seeks damages (Defs.' Br. 17-18) fails because EPPs explicitly do not seek damages under the UCL. *See* SCAC ¶ 396 ("Plaintiffs and the members of the Class are accordingly entitled to *equitable* relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits . . . ."). Defendants' argument that "[t]here is no need for any injunction [because] the

event complained of (restraining agreements) has passed," (Defs.' Br. 18), completely ignores the continuing nature of the harm here and the likelihood of reoccurrence. *See* § II, *supra*. And, as to Defendants' argument that EPPs cannot pursue an equitable claim (Defs' Br. 18), there is "no basis in California or federal law for prohibiting the plaintiffs from pursuing their equitable claims in the alternative to legal remedies at the pleadings stage." *Adkins v. Comcast Corp.*, WL 3491973, at *3 (N.D. Cal. Aug. 1, 2017); *see also Doe v. Epic Games, Inc.*, 435 F. Supp. 3d 1024, 1051-52 (N.D. Cal. 2020) (denying dismissal).

The majority of the cases cited by Defendants do not involve the UCL at all. *See Travelers Ins. Co. v. 633 Third Assocs.*, 973 F.2d 82, 88 (2d Cir. 1992) (involving a fraud claim under New York law and specifically "emphasiz[ing] the narrowness of [the] decision"); *CMG Holdings Grp. v. Wagner*, 2016 WL 4688865, at *10 (S.D.N.Y. Sept. 7, 2016) (involving a request for a constructive trust); *Safka Holdings LLC v. iPlay, Inc*., 42 F. Supp. 3d 488, 493 (S.D.N.Y. 2013) (involving breach of contract, repudiation and anticipatory breach of contract, and breach of the covenant of good faith and fair dealing); *Brumfield v. Trader Joe's Co.*, 2018 WL 4168956, at *5 (S.D.N.Y. Aug. 30, 2018) (involving an unjust enrichment claim); and *Crigger v. Fahnestock & Co.*, 2003 WL 22170607, at *12 (S.D.N.Y. Sept. 18, 2003) (involving fraud claims). Not only did *Robinson v. Sanctuary Rec. Grps., Ltd.*, 763 F. Supp. 2d 629, 632 (S.D.N.Y. 2011), not involve the UCL, but plaintiffs there also had the right to pursue monetary damages, which EPPs do not seek under the UCL here. Also, unlike here, plaintiffs in *Sonner v. Premier Nutrition Corp*., 971 F.3d 834, 844 (9th Cir. 2020), and *Julian v. TTE Tech., Inc.*, 2020 WL 6743912, at *5 (N.D. Cal. Nov. 17, 2020), brought claims under both the UCL and the California Consumers Legal Remedies Act. EPPs' UCL claims have been sufficiently pleaded and should remain.

**B. EPPs Have Standing to Bring a Claim Under CUTPA**

Defendants implausibly try to argue that EPPs' *consumer protection* claims arising under Connecticut's Unfair Trade Practices Act should be dismissed because Connecticut's *antitrust* statute followed *Illinois Brick* before July 10, 2017. Defs.' Br. 19-20. First, as argued above, Connecticut's repealer statute was enacted before much of Defendants' anticompetitive conduct occurred, and the injury that resulted from that conduct went far beyond the execution dates of the unlawful agreements. *See* § IV.A, *supra*. Second, the date of the repealer statute under Connecticut's antitrust law is irrelevant; Connecticut's consumer protection laws separately provide EPPs the right to bring a claim under those laws based on anticompetitive conduct regardless of the status of Connecticut's antitrust law. *See Broadway Theatre Corp. v. Buena Vista Pictures Distribution*, 2002 WL 32502100, at *4 (D. Conn. Sept. 19, 2002) ("[T]he fact that a practice is not outlawed by the antitrust laws does not necessarily preclude that practice from CUTPA's reach as otherwise 'unfair.'").

Defendants incorrectly rely on the Connecticut Supreme Court's decision in *Soto v. Bushmaster Firearms Int'l, LLC*, 202 A.3d 262, 288 (Conn. 2019), for the proposition that "a CUPTA claim will lie only when the purportedly unfair trade practice is alleged to have directly and proximately caused the plaintiff's injuries," and thus Plaintiffs here do not have standing. But as the court in *Soto* went on to explain: "the court in *Ventres* did not hold that every CUTPA claim requires a business relationship between a plaintiff and a defendant. Indeed, we did not analyze that issue, and at no point did we examine either the text or the legislative history of the statute, both of which, as we previously explained, *strongly suggest that the legislature did not intend to impose a privity requirement*." *Id.* at 289 (emphasis added) (citing *Ventres v. Goodspeed Airport, LLC*, 275 Conn. 105, 881 A.2d 937 (2005)). Indeed, the court in *Soto* held that administrators of estates of the Sandy Hook victims had standing under CUPTA to sue the

manufacturers, distributors, and sellers of the assault rifle used in the mass school shooting. 202

A.3d at 289, 291. So too here, EPPs have standing to bring a claim under CUPTA.

### C. EPPs' Claims Under the Consumer Protection Laws of Idaho, Illinois, and Utah Reach Defendants' Anticompetitive Conduct

Defendants contend that EPPs' Idaho, Illinois, and Utah consumer protection claims

cannot reach anticompetitive behavior. Defs.' Br. 20-25. Not so. The consumer protection laws

cited in the Complaint are largely modeled after, and interpreted consistently with, Section 5 of

the Federal Trade Commission Act, which prohibits all "practices that violate the Sherman Act

and the other antitrust laws." *FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 454 (1986). As

one court observed, "it is an analytically sensible and entirely fair operation of pleading

standards and substantive law to conclude that the . . . allegations giving rise to alleged

antitrust violations also give rise to the [p]laintiffs' [consumer protection] claim." *In re*

*Processed Egg Prods. Antitrust Litig.*, 851 F. Supp. 2d 867, 895 (E.D. Pa. 2012). Accordingly,

because EPPs' consumer protection claims reach anticompetitive conduct, there is no basis to

dismiss them. And to the extent that any statutes do require plaintiffs to plead deceptive conduct,

EPPs have done so. *See* SCAC ¶ 389.

***Idaho.*** Idaho's Consumer Protection Act ("ICPA") protects "both consumers and businesses

against unfair methods of competition and unfair or deceptive acts and practices in the conduct of

trade or commerce, . . . and the statute is to be construed liberally." *In re DDAVP Indirect*

*Purchaser Antitrust Litig.*, 903 F. Supp. 2d 198, 224-25 (S.D.N.Y. 2012) (citations and internal

quotes omitted). The ICPA likewise instructs courts to give "due consideration and great weight .

. . to the interpretation of the federal trade commission and the federal courts relating to" Section

5(a)(1) of the FTC Act, which, as noted above, prohibits anticompetitive conduct. *In re New Motor*

*Vehicles Canadian Export Antitrust Litig.*, 350 F. Supp. 2d 160, 184 (D. Me. 2004). Thus, EPPs'

allegations of anticompetitive conduct sufficiently state a claim under the ICPA. *See, e.g.*, *In re Loestrin 24 Fe Antitrust Litig.*, 410 F. Supp. 3d 352, 380 (D.R.I. 2019) (upholding ICPA claims based on anticompetitive conduct); *DDAVP*, 903 F. Supp. 2d at 225 (same).

**Illinois.** Courts have held that "[a] plaintiff may allege that conduct is unfair under the [Illinois Consumer Fraud Act ("ICFA")] without alleging that the conduct is deceptive." *Namenda II*, 2018 WL 7197233, at *41 (quoting *Hill v. PS Illinois Tr.*, 856 N.E.2d 560, 568 (Ill. Ct. App. 2006)). Here, EPPs have pled both. Moreover, courts have construed the statute to prohibit anticompetitive conduct, including unlawful reverse payments. *See Namenda II*, 2018 WL 7197233, at *41 (denying dismissal of ICFA claim based on anticompetitive conduct).

**Utah.** Utah's Consumer Sales Practices Act ("UCSPA") prohibits both unconscionable *and* deceptive conduct. *See* Utah Code Ann. §§ 13-11-4 (deceptive conduct) and 13-11-5 (unconscionable conduct). The statute is to be "construed liberally" and its purpose is "to make state regulation of consumer sales practices not inconsistent with the policies" of the FTC Act. Utah Code § 13-11-2. Under the UCSPA, unconscionable conduct can be satisfied by pleading a scheme to suppress competition causing consumers to pay higher prices. *See Namenda II*, 2018 WL 7197233, at *50-51 (upholding UCSPA claim in reverse payment case); *In re Packaged Seafood Prods. Antitrust Litig.*, 242 F. Supp. 3d 1033, at 1086-87 (S.D.C.A. 2017) (upholding UCSPA claims based upon antitrust conspiracy). Neither *Carlie v. Morgan*, 922 P.2d 1, 6 (Utah 1996) nor *Berneike v. CitiMortgage, Inc.*, 708 F.3d 1141, 1150 (10th Cir. 2013), cited by Defendants, are antitrust cases, and thus neither had the occasion to opine on the UCPSA's applicability to antitrust matters. In fact, the UCPSA has never been found to *not* apply to anticompetitive conduct.

### D.  EPPs Are "Consumers"

Packaged alternatively as a standing argument, Defendants argue for dismissal of certain state law claims because EPPs are not "consumers" or their transactions here are not "consumer transactions" or for personal or household use. Defendants' arguments all fail.

Defendants ignore that many putative Class members are consumers that meet their interpretation of the statutory definition. Nevertheless, named EPPs participate in consumer transactions by paying some or all of the prices charged to individual consumers, and, as a result, pay a portion of any overcharges. As such, every purchase at issue in this case is made for personal or household use. EPPs do not purchase drugs for resale, distribute products, or act as intermediaries in the distribution chain. To the extent Defendants contend that EPPs were required to purchase for "purely personal reasons" under certain state consumer protection statutes, Defs.' Br. 24, EPPs have pleaded exactly that. SCAC ¶¶ 47-53 (alleging each named EPP "purchased, paid, and/or provided reimbursement for some or all of the purchase price of Bystolic for personal and/or household use . . . ."). Defendants also appear to suggest that EPPs and other Class members are not consumers within the definition of the consumer protection statutes. To the contrary, neither the laws nor cases interpreting them limit the definition of consumers to natural persons.

***Massachusetts.*** Third-party payors like EPPs, who reimburse prescription costs, may bring claims under Mass. General Laws c. 93A § 9 because they are "not motivated by the desire to make money" in the transactions. *In re Pharm. Indus. Average Wholesale Price Litig.*, 491 F. Supp. 2d 20, 82 (D. Mass. 2007) ("*AWP*"); *see also Staley v. Gilead Scis., Inc.*, 446 F. Supp. 3d 578, 633 (N.D. Cal. 2020) ("Because a party's status as a nonprofit affects the analysis as to whether it has a § 9 or § 11 claim, the Court shall allow the union insurers' claims based on the Massachusetts Consumer Protection Act to proceed."). EPPs here are Taft-Hartley funds or municipalities

27

providing prescription drug coverage for their members or employees. They are not profit seeking entities whose "core mission" is "engag[ing] in trade or commerce." *AWP*, 491 F. Supp. 2d at 81. Accordingly, they can bring a claim under Section 9.

*Missouri.* The Missouri Merchandising Practices Act ("MMPA") defines "person" to include entities. Mo. Rev. Stat. § 407.010(5). The personal use limitation applies to the nature and intended use of the merchandise, not to the identity of the purchaser. *See F.T.C. v. Mylan Labs, Inc.*, 62 F. Supp. 2d 25, 48 (D.D.C.). Thus, EPPs, payors of prescription drug for the personal use of their members and beneficiaries, are consumers under the MMPA. *See, e.g., Staley*, 446 F. Supp. 3d at 640 (permitting third-party payors' claims under the MMPA and observing the absence of legislative history indicating that a consumer is restricted to one who purchases for their own use). Defendants' cases are not on point. *Packaged Seafood*, 242 F. Supp. 3d at 1074, addressed only "intermediary purchasers who later repackage and resell prior purchases to consumers," which EPPs do not. *In re Cast Iron Soil Pipe & Fittings Antitrust Litig.*, 2015 WL 5166014, at *31 (E.D. Tenn. June 24, 2015), did not address the statute's definition of "person." And despite the rulings in *Exforge* and *In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*, 355 F. Supp. 3d 145, 157 (E.D.N.Y. 2018), Missouri courts themselves are clear that the MMPA "is broad in scope in order to prevent evasion by overly meticulous definitions . . . .". *Clement v. St. Charles Nissan, Inc.*, 103 S.W.3d 898, 900 (Mo. Ct. App. 2003). Any reading of the MMPA to exclude entities as "persons" is just that—an evasive way to circumvent the plain reading of the statute.

Further, "Defendants have cited no authority commensurate with the proposition that Missouri restricts recovery under the MMPA to consumer-oriented conduct not covered by the Complaint." *Namenda II*, 2018 WL 7197233, at *46. Finally, because EPPs are entitled to bring an action under Missouri consumer protection law, EPPs are entitled to "institute an action as

representative or representatives of a class" of such consumers. Mo. Rev. Stat. § 407.025(5). Nothing in the statute requires that named plaintiffs be Missouri citizens.

***Montana.*** Montana permits claims by any "consumer," Mont. Code Ann. § 30-14-133(1), which is defined as a "person," *id.* § 34-14-102(1), which in turn is defined to include entities. *Id.* § 34-14-102(6). The statute is "not limited to those who engage directly in consumer transactions." *New Motor Vehicles,* 350 F. Supp. 2d at 193. Defendants' cases do not apply here. In *In re Lidoderm Antitrust Litig.*, 103 F. Supp. 3d 1155, 1165 (N.D. Cal. 2015), the court held that the Montana statute excludes "persons who buy goods for resale," which EPPs do not. In *In re Nat'l Prescription Opiate Litig.*, 2019 WL 2477416, at *22 (N.D. Ohio Apr. 1, 2019), *R&R adopted in part, rejected in part*, 2019 WL 3737023 (N.D. Ohio June 13, 2019), the plaintiff argued that it had parens patriae standing to sue under Montana consumer protection law, and made "no effort to argue" that it met the statutory definition of "consumer." As discussed above, EPPs here fit the definition of "consumer" under Montana's consumer protection statute.

***Utah.*** EPPs similarly meet the definition of "person" under Utah's consumer protection statute, which includes entities. Utah Code Ann. § 13-11-3(5). The definition of "[c]onsumer transaction" in the statute refers to the purpose for which the product is *sold*. *See Id.* at § 13-11-3(2)(a).[10]

### E.  EPPs Are Permitted to Bring Consumer Class Actions

Defendants' arguments that certain states do not provide for or limit consumer class actions are incorrect. *See* Defs.' Br. 22, 27-29.

***Illinois.*** Defendants again raise their ill-advised standing argument under Illinois antitrust law in context of the Illinois's consumer protection statute. Defs.' Br. 22. But for the reasons those

---

[10] *Holmes v. Am. States Ins. Co.*, 1 P.3d 552, 557 (Utah 2000), addressed the definition of "supplier" and a wholly different factual situation.

arguments failed with respect to Illinois's antitrust law (§ IV.A, *supra*), they fail here. The class action bar in Illinois's consumer protection statute is procedural and therefore preempted by Rule 23 under *Shady Grove*.

**Montana.** Montana's class action bar "does not prevent individuals who would otherwise be members of the class from bringing their own separate suits or joining in a preexisting lawsuit." *In re Hydroxycut Mktg. & Sales Pracs. Litig.*, 299 F.R.D. 648, 654 (S.D. Cal. 2014); *see also* Mont. Code Ann. § 30-14-133. Thus, "[t]he substantive rights of these individuals are not affected" by whether the case proceeds as a class action, and under *Shady Grove*, they can pursue claims in a class action. *Hydroxycut*, 299 F.R.D. at 654.

**Utah**. Contrary to Defendants' argument, Utah's consumer protection statute does not prohibit class actions; it plainly permits them: "A consumer who suffers loss as a result of a violation of this chapter *may bring a class action for the actual damages* caused by an act or practice specified as violating this chapter by a rule adopted by the enforcing authority under Subsection 13-11-8(2) . . . ." § 13-11-19(4)(a). As alleged in the Complaint, the Utah Consumer Sales Practices Act "protect[s] consumers from suppliers who commit deceptive and unconscionable sales practices" and "encourage[s] the development of fair consumer sales practices." §§ 13-11-2(2). The statute provides that these terms are interpreted consistent with Section 5 of the FTC Act (15 U.S.C. § 45(a)), which also prohibits "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce." SCAC ¶ 432 (citing § 13-11-2; 15 U.S. § 45(a)(1). Even if Utah's statute did bar class actions, "Rule 23 supplants [this] state procedural rule[]." *Pork*, 495 F. Supp. 3d at 790.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss should be denied.

Dated: May 23, 2022                                         Respectfully submitted,

*/s/ Sharon K. Robertson*                                  */s/ Robin A. van der Meulen*
Sharon K. Robertson                                        Robin A. van der Meulen
Donna M. Evans                                             Gregory S. Asciolla
**COHEN MILSTEIN SELLERS & TOLL**                          Matthew J. Perez
**PLLC**                                                   Veronica Bosco
88 Pine Street, 14th Floor                                 **DICELLO LEVITT GUTZLER LLC**
New York, NY 10005                                         One Grand Central Place
Telephone: (212) 838-7797                                  60 East 42nd Street, Suite 4200
Facsimile: (212) 838-7745                                  New York, NY 10165
srobertson@cohenmilstein.com                               Telephone: (646) 933.1000
devans@cohenmilstein.com                                   Facsimile: (646) 494-9648
                                                           rvandermeulen@dicellolevitt.com
                                                           gasciolla@dicellolevitt.com
Robert A. Braun                                            mperez@dicellolevitt.com
Cohen Milstein Sellers & Toll PLLC                         vbosco@dicellolevitt.com
1100 New York Avenue, NW
Fifth Floor
Washington, D.C. 20005                                     *Interim Co-Lead Counsel for the Proposed*
Telephone: (202) 408-4600                                  *End-Payor Class*
rbraun@cohenmilstein.com

*Interim Co-Lead Counsel for the Proposed*
*End-Payor Class*